# 10-4398

## United States Court of Appeals

*for the*

## Second Circuit

_____

DR. OLIVER JOVANOVIC ,

*Plaintiff-Appellant,*

v.

CITY OF NEW YORK, MILTON BONILLA, SHIELD NO. 61, individually and in his official
capacity, LINDA FAIRSTEIN, NEW YORK COUNTY ASSISTANT DISTRICT ATTORNEY,
individually and in her official capacity,

*Defendants-Appellees,*

and

GAIL HEATHERLY, NEW YORK COUNTY ASSISTANT DISTRICT ATTORNEY,
individually and in her official capacity,

*Defendant.*

_____

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

BRIEF OF PLAINTIFF-APPELLANT

Diarmuid White
WHITE & WHITE
148 East 78th Street
New York, NY 10075
(212) 861-9850

*Attorney for Plaintiff-Appellant*

*On the brief*
 Diarmuid White
 Brendan White

# Table of Contents

Page

Table of Authorities ..................................... iv

Preliminary Statement ..................................... 1

Statement of Subject Matter
 And Appellate Jurisdiction ............................... 1

Statement of Issues Presented for Review ................. 1

Statement of the Case .................................... 2

Statement of Facts ....................................... 5

   (a.) Detective Bonilla Interviews The Complainant,
   Conducts No Investigation into Her Bizarre
   Allegations, Reads Neither Her Written Statement
   Nor The Report of The Doctor Who Examined Her,
   Yet Arrests Jovanovic Eight Days Later And Purports
   to Have Seen Two Burnt Candles in Jovanovic's
   Apartment ............................................. 5

   (b.) Bonilla Claims The Candles Had Been Removed
   When Jovanovic's Apartment Is Later Searched .......... 11

   (c.) An Expert on Criminal Investigations And False
   Rape Claims Finds That Bonilla Seriously Deviated
   from Accepted Police Procedures by Failing to
   Investigate, Including Failing to Interview The
   First Person The Complainant Said She Spoke to about
   The Alleged Incident, A Person with Whom She Was
   Involved in A Sadomasochistic Relationship ............ 12

   (d.) During The Week Leading up to The Grand
   Jury Presentation, Inflammatory Extrajudicial
   Statements by ADA Fairstein Fueled A Firestorm
   of Adverse And Distorted Media Coverage
   Demonizing Jovanovic As A Cyber-Fiend ................. 15

Summary of Argument ...................................... 23

Argument ................................................. 24

POINT I

    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
    JUDGMENT TO DETECTIVE BONILLA ON THE CLAIM OF
    MALICIOUS PROSECUTION ............................... 24

    (a.) Bonilla's Fabricated Evidence That He
    Saw Burnt Candles in Jovanovic's Apartment And
    They Had Been Removed When He Later Searched The
    Apartment Was Highly Material to The Entire
    Indictment .......................................... 25

    (b.) A Jury Could Reasonably Find That The Pre-
    sumption of Probable Cause Was Overcome Because
    The Indictment Was Secured through Perjury Or Bad
    Faith ............................................... 34

    (c.) The District Court's Conclusion That There
    Was Probable Cause Independent of The Presumption
    Is Factually Mistaken, Takes Conflicting Versions
    of The Facts From The Jury, And Erroneously Views
    The Prosecutor's Actions As Vitiating Any Malicious
    Prosecution by Bonilla ............................. 36

    (d.) The District Court Failed to Recognize That,
    Once Bonilla Presented Fabricated Evidence to
    The Prosecutors, What They Did with It Afterwards
    Had No Effect on His Tortious Behavior ............ 41

POINT II

    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
    JUDGMENT TO DETECTIVE BONILLA ON PLAINTIFF'S
    "FAIR TRIAL" CLAIM ................................. 43

POINT III

    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
    JUDGMENT TO DEFENDANT FAIRSTEIN ON PLAINTIFF'S
    "FAIR TRIAL" CLAIM REGARDING HER EXTRAJUDICIAL
    STATEMENTS ......................................... 45

    (a.) A Jury Could Reasonably Find That The
    Prosecutor's Cursory Instruction to The Grand
    Jury Not to Consider Anything in The News-

papers Or on Television Was Inadequate to
Neutralize The Prejudice to Jovanovic ............. 48

(b.) A Jury Could Find That It Was Foreseeable to
Fairstein That Her Inflammatory Extrajudicial
Statements Would Foster The False Testimony of A
Witness Like Chambers, And Whether Chambers'
Testimony--Contradicted by Jovanovic--Was False
Was Not A Question for The Judge, But for A Jury ... 53

POINT IV

THE DISTRICT COURT ERRED IN RULING THAT
PLAINTIFF'S <u>MONELL</u> CLAIM BASED ON THE NYPD'S
FAILURE TO TRAIN DETECTIVES REGARDING FALSE
RAPE CLAIMS WAS NOT SUFFICIENTLY PLED ............... 58

Conclusion .............................................. 62

# Table of Authorities

Page

<u>Cases</u>

<u>Ambrose v. City of New York</u>,
623 F. Supp. 2d 454 (S.D.N.Y. 2009) ...................... 60

<u>Amnesty America v. Town of West Hartford</u>,
361 F.3d 113 (2d Cir. 2004) ............................. 60

<u>Bell Atlantic Corp. v. Twombly</u>,
550 U.S. 544 (2007) ..................................... 60

<u>Bollenbach v. United States</u>,
326 U.S. 607 (1946) ..................................... 51

<u>Boyd v. City of New York</u>,
336 F.3d 72 (2d Cir. 2003) .............................. 34

<u>Cameron v. City of New York</u>,
598 F.3d 50 (2d Cir. 2010) .......................... 25, 42

<u>Colon v. City of New York</u>,
60 N.Y.2d 78 (1983) ................................. 27, 34

<u>Conley v. Gibson</u>,
355 U.S. 41 (1957) ...................................... 60

<u>Curley v. Village of Suffern</u>,
269 F.3d 65 (2d Cir. 2001) .............................. 35

<u>Devenpeck v. Alford</u>,
543 U.S. 146 (2004) ..................................... 39

<u>Foley v. Parker</u>,
488 F.3d 377 (6th Cir. 2007) ............................ 50

<u>Harris v. State</u>,
302 A.D.2d 716 (3d Dept. 2003) .......................... 35

<u>Hernandez v. State</u>,
228 A.D.2d 902 (3d Dept. 1996) .......................... 35

<u>Higazy v. Templeton</u>,
505 F.3d 161 (2d Cir. 2007) ..................... 43, 49, 56

Jocks v. Tavernier,
316 F.3d 128 (2d Cir. 2003) ......................... 44, 48

Krulewitch v. United States,
336 U.S. 440 (1949) ..................................... 51

Lowth v. Town of Cheektowaga,
82 F.3d 563 (2d Cir. 1996) ............................. 40

Manganiello v. City of New York,
612 F.3d 149 (2d Cir. 2010) ......................... 27, 33

McClellan v. Smith,
439 F.3d 137 (2d Cir. 2006) ............................ 27

Mitchell v. Kugler,
2009 U.S. Dist. LEXIS 4655 (E.D.N.Y. 2009) .............. 44

Murphy v. Lynn,
118 F.3d 938 (2d Cir. 1997) ............................ 42

Nesbitt v. County of Nassau,
2006 U.S. Dist. LEXIS 88262 (E.D.N.Y. 2006) ............. 60

Panetta v. Crowley,
460 F.3d 388 (2d Cir. 2006) ......................... 37, 39

People v. Baker,
14 N.Y.2d 266 (2010) ................................... 51

People v. Calbud,
49 N.Y.2d 389 (1980) ................................... 52

People v. Jovanovic,
263 A.D.2d 182 (1st Dept. 1999) ................ 2, 7, 22, 38

Posr v. Doherty,
944 F.2d 91 (2d Cir. 1991) ............................. 33

Powers v. Coe,
728 F.2d 97 (2d Cir. 1984) ............................. 46

Powers v. McGuigan,
769 F.2d 72 (2d Cir. 1985) ............................. 57

<u>Richards v. City of New York</u>,
2003 U.S. Dist. LEXIS 8037 (S.D.N.Y. 2003) .............. 35

<u>Riciutti v. N.Y. City Transit Authority</u>,
124 F.3d 123 (2d Cir. 1997) ..................... 43, 44, 45

<u>Savino v. City of New York</u>,
331 F.3d 63 (2d Cir. 2003) ............................. 27

<u>Scott v. United States</u>,
436 U.S. 128 (1978) .................................... 39

<u>Swierkiewicz v. Sorema N.A.</u>,
534 U.S. 506 (2002) .................................... 61

<u>Townes v. City of New York</u>,
176 F.3d 138 (2d Cir. 1999) ........................ 48, 49

<u>United States v. Delli Paola</u>,
229 F.2d 319 (2d Cir. 1956) ............................ 51

<u>United States v. Rem</u>,
38 F.3d 634 (2d Cir. 1994) ..................... 25, 41, 56

<u>United States v. Stewart</u>,
433 F.3d 273 (2d Cir. 2006) ............................ 51

<u>Viola v. Philips Medical System of N. America</u>,
42 F.3d 712 (2d Cir. 1994) ............................. 1

<u>Wallace v. Kato</u>,
549 U.S. 384 (2007) ..................................... 4

<u>Zahrey v. Coffey</u>,
221 F.3d 342 (2d Cir. 2000) .................... 44, 49, 57

<u>Statutes & Rules</u>

28 U.S.C. § 1291 ....................................... 1

28 U.S.C. § 1331 ....................................... 1

Fed. R. Civ. P. 12(c) .................................. 4

Fed. R. Civ. P. 30(b)(6) ....................... 15, 58, 61

## Preliminary Statement

Dr. Oliver Jovanovic appeals from a judgment entered on September 29, 2010, in the United States District Court for the Southern District of New York (Paul A. Crotty, D.J.) granting defendants' motion for summary judgment.

## Statement of Subject Matter
## and Appellate Jurisdiction

This appeal is from a final judgment of the United States District Court for the Southern District of New York, which had jurisdiction pursuant to 28 U.S.C. § 1331. The judgment was entered on September 29, 2010, and a notice of appeal was timely filed on October 27, 2010. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## Statement of Issues Presented for Review

1.  Whether, viewing the evidence in a light most favorable to plaintiff and drawing all reasonable inferences in his favor, the district court erred in granting defendants summary judgment?  See Viola v. Philips Med. Sys. of N. Am., 42 F.3d 712, 716 (2d Cir. 1994).

2.  Whether the district court erred in ruling that plaintiff's Monell claim based on the NYPD's failure to train detectives regarding false rape claims was not sufficiently pled?

**Statement of the Case**

On December 21, 1999, Oliver Jovanovic, who when arrested in 1996 had been a Columbia University doctoral candidate two weeks away from defending his doctorate in microbiology, was in New York state prison serving the twentieth month of a mandatory minimum sentence of 15-years to life imprisonment. Following a jury trial in Supreme Court, New York County, in what was characterized in the press as the "Cybersex Torture" case, he had been convicted of kidnapping, sexually abusing and assaulting within his apartment a Barnard College student, Jamie Rzucek, whom he met in an AOL chat room months earlier and who went with him to his apartment after a dinner date.

On that December 1999 day, however, his conviction was reversed on appeal and a new trial ordered, because the trial court had improperly excluded the complainant's own email messages to Jovanovic which were "highly relevant … to establish that she purposefully conveyed to Jovanovic an interest in engaging in consensual sadomasochism with him" and because the court "almost completely prevented Jovanovic from presenting the viable defense that the complainant had reason to fabricate the nonconsensual and violent elements of her story." People v. Jovanovic, 263 A.D.2d 182, 196, 199 (1st Dept. 1999).

In 2001, after Jovanovic maintained his innocence, refused a plea offer to a non-sexual misdemeanor with no prison time at all, and demanded a retrial in which he would again face the mandatory minimum sentence of 15-years to life imprisonment--insisting that none of the alleged acts of violence ever occurred, the conduct that did occur was consensual, and Rzucek was free to leave his apartment, and did leave, when she chose to do so--the indictment was dismissed with prejudice, on the prosecution's motion.

In 2004, after Jovanovic had earned his Ph.D. degree from Columbia with distinction, he filed a § 1983 action alleging false arrest, malicious prosecution, malicious abuse of process, and denial of his right to a fair trial, on the grounds that, in order to secure his indictment and conviction, Milton Bonilla, the detective who arrested him and testified before the grand jury and at trial, had fabricated evidence and given false testimony and that the Assistant District Attorney ("ADA") who was chief of the District Attorney's Sex Crimes Unit, Linda Fairstein, had made highly improper and prejudicial extrajudicial statements.  He further alleged, as a "<u>Monell</u> claim," that defendant City of New York's ("the City") policy and customs cultivated such improprieties by, among other things, failing to train detectives properly.

On defendants' motion to dismiss the complaint under Fed. R. Civ. P. 12(c), and after re-pleading, only the false arrest claim was dismissed, as time-barred, on the defendants' motion for reconsideration in light of the intervening decision in Wallace v. Kato, 549 U.S. 384 (2007). Jovanovic does not appeal from that ruling.

In December 2009, following discovery, defendants moved for summary judgment, principally on the basis that the prosecution of Jovanovic was supported by probable cause and that his right to a fair trial was not impinged by the defendants' conduct. On September 28, 2010, the district court granted that motion in its entirety. In short, the court found that Jovanovic's claims were defeated by the existence of probable cause or the presumption of probable cause arising from the grand jury's indictment and that the alleged misconduct of the defendant detective, prosecutors and City was not the cause of the deprivation of his liberty. As to one Monell claim strongly supported by evidence disclosed in discovery, the court ruled that the claim was not sufficiently pled.

On this appeal Jovanovic shows that the district court's analysis regarding probable cause was flawed, because evidence fabricated by Detective Bonilla was highly material to the evidence supporting probable cause, as it

was later to Jovanovic's conviction. Jovanovic further shows that defendant Fairstein's unethical extrajudicial statements to the press, in which he was demonized, prejudiced the grand jury that indicted him and encouraged attention-seekers to emerge with false claims about him. Finally, Jovanovic demonstrates that the court erred in ruling that his <u>Monell</u> claim regarding the New York City Police Department's ("NYPD") failure to train Sex Crimes detectives was not sufficiently pled, because defendants incontestably had "fair notice" of that claim.

### Statement of Facts

(a.) Detective Bonilla Interviews The Complainant,
Conducts No Investigation into Her Bizarre
Allegations, Reads Neither Her Written Statement
Nor The Report of The Doctor Who Examined Her,
Yet Arrests Jovanovic Eight Days Later And Purports
<u>to Have Seen Two Burnt Candles in Jovanovic's Apartment</u>

On November 27, 1996, Detective Bonilla and Detective Charles Cullen of the NYPD Manhattan Special Victims Squad ("MSVS") responded to a call from the head of security at Barnard College, Bill O'Connor, who stated that a student had said that she was held in an apartment and sexually abused (DX-Q at 26),[1] although O'Connor had "avoided asking

---

[1]  "DX" and "PX" refer to the exhibits submitted by Defendants and Plaintiff, respectively, on the summary judgment motion.  Numbers preceded by "A" refer to pages of the Appendix.

her any in-depth questions about what had taken place."
(DX-L at 51-52)

After O'Connor introduced Rzucek, Bonilla took her to
the MSVS offices, interviewed her and thereafter created an
interview report, a "DD5," relating that Rzucek recounted a
dinner date[2] with Jovanovic, whom she had met by email in
May or June of 1996 and with whom she resumed communicating
by email in September, with numerous intellectual chats;
that she went to his apartment, where he tied her to a
futon, returned with a candle, dumped hot wax on her inner
thighs near her vagina and on her stomach; that he bit her
nipples, taped her mouth, and told her how Jeffrey Dahmer
had killed his victims; that he hit her with a club; that
he untied her from the futon, then tied her arms and ankles
together[3] and blindfolded her; that he inserted something--
she did not believe it to be his penis[4]--into her vagina and
rectum; that he told her how stupid she was for coming to
his apartment; how she managed to untie herself, fight off
Jovanovic while getting dressed, and escape from the
apartment; and that after returning to her dorm she went

_____

[2]    Their date was five days earlier, on November 22,
1996, according to the felony complaint that was eventually
attested to by Bonilla.   (DX-SS)
[3]    Bonilla saw no ligature marks on her wrists.   (PX-2
at 60-61)
[4]    At trial, Rzucek was to testify that "I think it was
a penis."   (PX-91 at 1243)

over to "Luke's place"[5] and explained what happened. (DX-Q at 30; DX-G)

After interviewing Rzucek, Bonilla asked her to write out a statement, and she did so--eight pages long--but Bonilla did not bother to read it when she finished (DX-Q at 38, Bonilla Depo. Tr. at 40[6]; DX-H)  In that statement, Rzucek wrote that after she had been tied to the futon she voluntarily took off her sweater when Jovanovic said to (DX-H at 1) and apparently her pants as well.  (DX-H at 7) (In the grand jury she testified that after she took off her sweater, "He told me to take my pants off, so I did." (DX-F at 16))  Rzucek added in her written statement that she had been suffocated and that ice had been used to remove the marks from the hot wax.  (DX-H at 3-4) Significantly, she added that she "bled vaginally for three days," that she can't have a bowel movement because of the

_____

[5]    As discussed below, the reference is to Luke Dubois, with whom Rzucek was involved in a sadomasochistic relationship according to evidence excluded by the trial court, but which the Appellate Division held should have been admitted to support the argument that Dubois had caused Rzucek's bruising.  263 A.D.2d at 196, 198.

[6]    Although Bonilla's failure to read the handwritten statement was noted numerous times in Plaintiff's Rule 56.1 statements and his memorandum of law, was not disputed by defendants, and was referred to in the court's decision, at 15, Plaintiff inadvertently omitted from PX-2--excerpts from Bonilla's lengthy deposition--page 40, in which he was asked, "After she finished writing her statement, did you read what she had written?", and he answered, "No."  A copy of page 40 is reproduced in the Appendix at A-93.

pain, and "had a heavy flow of blood from the rectal area."
(DX-H at 8)

Rzucek also elaborated on her fantastic escape from Jovanovic, who she noted was a karate instructor (DX-H at 4):

> I took my hands and untied my feet with him
> trying to fight me down. Then I ran for my pants
> and he ran after me. And I was struggling.
> Before when he attacked me I was just inept and
> scared and didn't move (so the punishment would
> stop). But now he was hurting me, clawing my
> breasts, pinning me with his legs and I just kept
> on fighting and screaming and trying to get my
> clothes on. I have no idea where this source of
> strength emerged from--fear for my life I guess--
> I grabbed my coat beside the door and ran. (DX-H
> at 7)

Rzucek wrote that after she got home, she "called a friend and stayed at their house," not mentioning Dubois' name. (DX-H at 8)

Earlier on the same day as Bonilla interviewed Rzucek, November 27, 1996, she had been examined at Barnard Health Services by Dr. Karlene Chin-Quee an obstetrician-gynecologist. (DX-C at 1827, 1831) Rzucek told the doctor that someone had bound her; spoke of serial killers like Jeffrey Dahmer; "her clothes were removed"; she was bitten on the breasts; candle wax was dripped on her breasts and genital area; she was hit on the inner thighs with a police club; "she recalls that she may have been drugged because

she had a loss of time"; she had cotton placed in her mouth and duct tape put over it; and "she doesn't have recollection of--she felt she had been sodomized." (DX-C at 1844-46) Asked by Chin-Quee if there was any penetration of her vagina, anus or oral area, Rzucek answered, contrary to what she told Bonilla and testified at trial, that she could not recall. (PX-90 at 1927-28)

Dr. Chin-Quee examined Rzucek externally, did a pelvic examination with Rzucek's legs in stirrups, inserted a speculum into the vagina to see the walls, conducted a rectovaginal examination, and took cultures with swabs. (PX-90 at 1853; DX-C at 1864) There were no bruises, scratches or abrasions on the vaginal area and no lacerations or bruises in the anal area. (PX-90 at 1853, 1915-18) Chin-Quee found no evidence of rectal bleeding--a hemoccult test was negative--and reported no evidence of vaginal bleeding. (PX-90 at 1918; DX-N)

There were no bruises on Rzucek's thighs and no burn marks, no teeth marks, and no scabbing, swelling, redness or tenderness in the nipple area. (PX-90 at 1919, 1923-24) Chin-Quee did see some yellowish bruises on the upper body and a purplish bruise over the right breast. (DX-O at 311-13; DX-YY) When Chin-Quee inserted two fingers into the vagina and touched the cervix and the area next to the

uterus, Rzucek's mannerisms indicated she was "tender" and "uncomfortable." (DX-C 1855-57, 1862) Upon the rectovaginal examination Rzucek was also tender and sore. (DX-C at 1864-65)

Dr. Chin-Quee took notes of her examination, which constituted the Barnard Health Services records. (DX-C at 1831-32; DX-N) The notes included a four-page narrative of Rzucek's description of events, including, "No recollection of vaginal, rectal, or oral penetration." (DX-N at 53) On December 5, 1996, Bonilla picked up those records at Barnard, but he never bothered to look at them. (PX-2 at 82-83) Rzucek had told him she saw someone for medical attention, but Bonilla had "no idea" who. (PX-2 at 54)

After interviewing Rzucek on November 27, 1996, Bonilla and Cullen drove her to Jovanovic's apartment building, where she confirmed that he, known to her as "Oliver," resided in apartment 2-F. (DX-Q at 70-71)

It was not until more than a week later, on December 5, 1996, that Bonilla and Cullen went to Jovanovic's apartment, told him they needed to talk to him about a problem at the school, and he spoke to them inside his apartment. (DX-Q at 118; DX-FF at 51) Jovanovic agreed to go to Bonilla's office, and while Bonilla was waiting for Jovanovic to dress, Bonilla purportedly saw two burnt

candles on a table right by the doorway.[7] (DX-FF at 51, PX-89 at 1551) Jovanovic went with Bonilla and Cullen to the MSVS offices. (DX-Q 118, 129) Jovanovic answered all questions asked of him but was not told that Rzucek accused him of anything. (PX-1 at 208-09, 216) He was arrested at MSVS offices when he asked for a lawyer, according to Bonilla (DX-Q 132), or was arrested in his apartment when he asked whether he needed a lawyer, according to Jovanovic. (PX-1 at 206-10)

(b.) Bonilla Claims The Candles Had Been Removed
When Jovanovic's Apartment Is Later Searched

After arresting Jovanovic, Bonilla obtained a search warrant, went to the holding cells at "the Tombs" and got the keys to the apartment from Jovanovic, after telling Jovanovic he had a search warrant. (DX-FF at 53-54) When Bonilla and other detectives arrived at the apartment, Jovanovic's mother, Sabina Jovanovic, was there. (DX-FF at 54) Jovanovic had called his parents and asked them to contact their attorney. (PX-1 at 215) His mother phoned the attorney and, on the attorney's advice, went to Jovanovic's apartment to monitor the search. (PX-19 at 49)

_____

[7] Jovanovic has denied that any such candles were in the apartment. (DX-A at 163) Indeed, there was no such table by the doorway, both according to Jovanovic's mother (PX-19 at 83-84) and to a Detective Parr, who was present when the apartment was later searched. (PX-108 at 52)

Jovanovic 49) She opened the door while keeping it chained, asked to see the warrant, and let Bonilla and Cullen in after reading it. (DX-FF at 54) Bonilla noticed that the candles he had purportedly seen on the table that morning were missing. (DX-FF at 54) Jovanovic's mother has denied seeing or removing any candles in the apartment. (PX-19 at 61)

Among the items seized by Bonilla were Jovanovic's computer and what Bonilla recognized and inventoried as karate belts. (PX-2 at 335-41) Bonilla found no traces of blood or wax on the floor, furniture, bedding or anywhere else in the apartment. (PX-2 at 80, 82)

**(c.) An Expert on Criminal Investigations And False Rape Claims Finds That Bonilla Seriously Deviated from Accepted Police Procedures by Failing to Investigate, Including Failing to Interview The First Person The Complainant Said She Spoke to about The Alleged Incident, A Person with Whom She Was Involved in A Sadomasochistic Relationship**

That Bonilla arrested Jovanovic solely on the word of Rzucek without conducting any further investigation, indeed without even reading her written statement or the Bernard Health Services records, was the subject of a highly critical evaluation by a retired Sex Crimes detective in the NYPD Manhattan Special Victims Squad and expert on criminal investigations and false rape claims, John Baeza, in a comprehensive 10-page, single-spaced report and

opinion, dated July 1, 2009, with copious exhibits, which plaintiff disclosed to defendants six months before the close of discovery. (PX-42)

In that report, based on an exhaustive review of materials related to the investigation of Jovanovic (PX-42 at 2), Baeza concluded that Bonilla's investigation deviated from accepted police procedures in "multiple and significant ways," including that he failed to read Rzucek's handwritten statement; failed to review Rzucek's medical records; never requested the NYPD's Crime Scene Unit to process the scene; failed to take photographs at the scene; failed to safeguard the crime scene; failed to take photographs of parts of Rzucek's body, other than a Polaroid of her breast, where she claimed injuries; failed to conduct <u>any</u> investigation of this case during the nine day period following the initial interview of the complainant on November 27, 1996; and never interviewed Luke Dubois, the first person Rzucek spoke to about the alleged incident. (PX-42 at 4)

Dubois, at the time of Jovanovic's date with Rzucek, was involved in a sadomasochistic relationship with her. When interviewed by law enforcement officials months <u>after</u> Jovanovic's arrest, Dubois stated that Rzucek had asked him "Can I be your slave?" (PX-35) At her request, he "tied

up her arms to his bed frame" and he "whipped her at the end [with] a belt." She "[t]hen said it wasn't hard enough. This surprised him." DuBois then hit her an additional "10-20 times [with] the belt." (PX-35)

In an email to Jovanovic two days prior to their date, Rzucek had referred to herself as a "sadomasochist," a "slave" and a "pushy bottom," i.e., a submissive partner who pushes the dominant one to inflict greater pain than he wants to.[8] (PX-31) Even though Rzucek told Bonilla that she had been communicating with Jovanovic by email, he never asked to see them.[9]

---

[8] In these emails, found by the Appellate Division to have been improperly precluded or redacted by the trial court, Rzucek said, "No duh, there's more, more interesting than sex, yes he [Dubois] did catch me, no sex, but he was a sadomasochist and now I'm his slave and its [sic] painful, but the fun of telling my friends 'hey I'm a sadomasochist' more than outweighs the torment." Jovanovic's responsive email said, "You're submissive sometimes? Should have told me earlier." In her reply, Rzucek said: "and yes, I'm what those happy pain fiends at the Vault call a 'pushy bottom'." (PX-31)

[9] In emails to others during the weeks prior to the date with Jovanovic, Rzucek had enthusiastically expressed her interest in sadomasochism: "Guess what I squirmed my way into late one eve???!! Sadomasochism!! Yea!" "yeshess it is quite depraved, I got tied to the bed, whipped, chocolate, handcuffs, the whole s-n-m schbang!"; "I believe I have the makings for a dominatrix, and look fine fine fine in leather"; "all I wanted to do was tell people that I was a slave and was into sadomasochism"; "and as to the s and m, bondage and discipline … its interesting how far I can expand my tolerance." (See, e.g. PX-32 at 7054, 7057, 7103)

In a section of Baeza's report entitled "The NYPD's Inadequate Training on False Rape Claims," he documented the markedly high incidence of false rape claims--at least 20 to 25 percent of all rape claims, according to multiple studies--and how the NYPD training in this area is virtually non-existent or, worse, misleading because it dramatically undercounted such claims at two to five percent. (PX-42 at 9-10)

Confirming the latter view, Detective Stephen Giuntini, produced by defendant City for deposition, pursuant to plaintiff's notice under Fed. R. Civ. P. 30(b)(6), requesting "[t]he person most knowledgeable about the [NYPD's] Detective Bureau's personnel training regarding sex crimes, including … determining unfounded and/or false allegations" (PX-18 at 10-11), testified that the NYPD's two-week course on sex crimes did not, to his recollection, even address the subject of false rape claims. (PX-18 at 53)

(d.) During The Week Leading up to The Grand
Jury Presentation, Inflammatory Extrajudicial
Statements by ADA Fairstein Fueled A Firestorm
of Adverse And Distorted Media Coverage
Demonizing Jovanovic As A Cyber-Fiend

Following his arrest by Bonilla, Jovanovic was arraigned on December 6, 1996, and the case was presented to the grand jury--significantly, with Rzucek and Bonilla

as the only witnesses--on December 13 and 19, 1996, when the indictment was returned. (DX-GG at 2, DX-H, PX-84) Primed by the inflammatory statements of defendant Fairstein, a firestorm of adverse and distorted media coverage condemning Jovanovic as a demon engulfed him during the week leading up to the grand jury presentation. For example, the New York Post's December 8, 1996, front page carried a photograph of Jovanovic with the headline "Prosecutor: Cyber fiend struck before" and the banner "HOW MANY MORE VICTIMS?" Inside, the Post reported under the headline "NEW COLUMBIA CYBERSTALK SHOCK" that "'Because he was so prepared for this and carried it off so smoothly, we believe there are other victims.' Fairstein said." (PX-51 at 11944) Notably, Fairstein has publicly acknowledged that "both sides use the press to great advantage before you get anywhere near the trial stage." (PX-61 at 2)

Defendants conceded in the district court that there were nine extrajudicial statements by Fairstein, although Plaintiff demonstrated that there were at least 30 statements.[10] The nine extrajudicial statements conceded were, as set forth by defendants:

---

[10] PX-50 and 51 is a compilation of the press articles and PX-53 contains CDs of television news coverage for the weeks of December 6 and December 11, 1996. Defendant

(a) On or about December 6, 1996: The case represents "a whole new entry in the acquaintance rape category."

(b) On or about December 6, 1996: The woman recalled Mr. Jovanovic's playing a violent movie about a killer doll or puppet.

(c) On or about December 6, 1996: When she said it was time to go, Mr. Jovanovic alternated between threats and jokes.

(d) On or about December 6, 1996: The candles allegedly used in the kinky torture had vanished by the time cops conducted their search (which Ms. Fairstein does not recall making, <u>see</u> Fairstein [deposition], 181-82).

(e) On or about December 7, 1996: "We believe that this is not the first time he [Jovanovic] did something like this."

(f) On or about December 7, 1996: "Because he was so prepared for this and carried it off so smoothly, we believe there are other victims."

(g) On or about December 7, 1996: Fairstein said she was going to speak with executives at America Online tomorrow to devise a way to ask other young women if they have been contacted by Jovanovic, whose screen name is Oliver Gre[y].

(h) On or about December 7, 1996: "He terrorized this young woman to the point that she was too frightened to call the authorities until weeks after it happened" (which statement Ms. Fairstein denies making, <u>see</u> Fairstein [deposition], 142)

(i) On or about December 9, 1996: The [Manhattan DA Sex Crimes Unit] is encouraging anyone who has had contact with Mr. Jovanovic to call prosecutors or the police.

---

Fairstein's statements are summarized in Plaintiff's Rule 56.1 Statement at ¶¶ 114-21.

(Defendants' Rule 56.1 Statement at ¶ 142.)

Unsurprisingly, as Plaintiff's press exhibits show, the media ran sensational articles when Fairstein made statements. A sample of statements attributable to Fairstein were:

>  --"For the next 20 hours, the prosecutor said, he tortured and sexually abused the woman, biting her, sexually assaulting her and threatening to dismember her as Jeffrey Dahmer, the serial killer, had done with his victims." "Then he tied the woman's legs to a chair and, once she was gagged as well, dropped all pretense of humor, Ms. Fairstein said." "Ms. Fairstein said the woman recalled Mr. Jovanovic's playing a violent movie about a killer doll or puppet." "Released after her ordeal, the victim finally decided to come forward after talking to relatives and friends, Ms. Fairstein said." "The case represents 'a whole new entry in the acquaintance rape category,' an illustration of what can happen when people mistakenly assume that character can be judged by an exchange of e-mail messages." "They also found literature on Mr. Dahmer … and seized Mr. Jovanovic's computer and books containing pictures of corpses …, the prosecutor said." <u>Biologist Is Charged In Sex Abuse Of a Student</u>, N.Y. Times, Dec. 7, 1996. (PX-50 at 1373)

>  --"The movie turned out to be an 'extremely violent' videotape," the prosecutor charged. The victim couldn't remember the name of the film, she said." "The stunned victim told her friends about the attack--and even went to a doctor--but was too terrified to tell police, Fairstein said." "The candles allegedly used in the kinky torture had vanished by the time the cops conducted their search, Fairstein said." <u>'NERD' BUSTED IN SEX ATTACK</u>, N.Y. Post, Dec. 7, 1996. (PX-50 at 1369)

--"There, prosecutors said, he tied her to a chair, stripped her and tortured her with hot wax and sex toys for nearly a full day, then let her go." Ph.D. student held on charge of sex torture, N.Y. Daily News, Dec. 7, 1996. (PX-50 at 1368)

--Fairstein told Channel 5 that Jovanovic "threatened to kill" the complainant. (PX-53, television news coverage from week of Dec. 6, 1996).

--"The young molecular biologist … allegedly began his attack after watching a violent movie with the woman, who tried to leave, said Linda Fairstein, head of the Manhattan district attorney's sex crimes unit." Columbia student held for sex torture, United Press International, Dec. 7, 1996. (PX-51 at 12010)

--"'He terrorized this young woman to the point that she was too frightened to call the authorities until weeks after it happens,' Fairstein said. 'We feel her courage for coming forward.'" Prober says suspect may have lured others, N.Y. Post, Dec. 8, 1996. (PX-50 at 1364)

--"Over the weekend America Online began downloading all correspondence between the suspect and the alleged victim to the Manhattan district attorney's office, sex-crimes prosecutor Linda Fairstein said." FEDS LEARN NET SUSPECT IS UP TO DATE G-MEN: STUDENT TRYST ON TAP, Dec. 9, 1996. (PX-50 at 1362)

--"About a dozen people from across the country have told the police and prosecutors in Manhattan that they communicated by computer with Oliver Jovanovic[.]" Others Tell of On-Line Chats With Torture Suspect, N.Y. Times, Dec. 10, 1996. (PX-50 at 1386). Similar statements were reported by the television stations NY1, Channel 4 and Channel 11. (PX-53)

--"Six other women have told prosecutors they spoke to Jovanovic, either online or in persons, or both…. The women said Jovanovic would

instantly switch from harmless discussions to
grislier topics such as dismemberment … Law
enforcement officials were seeking Jovanovic's
ex-girlfriends to ask them about his bizarre
habits." 'PREPPIE' SLAY ATT'Y MAY JOIN CYBERSEX
CASE, N.Y. Post, Dec. 11, 1996. (PX-50 at 1387)

As egregious as Fairstein's statements to the press
was the leak to the Daily News and New York Post for
publication on December 7, 1996, of a post-incident email
in which Jovanovic had said to Rzucek in part: "Is it a
good idea to go somewhere with someone you do not know? Do
you think you know how to defend yourself? Do you really
know what you are doing?" (PX-50 at 1368, 1370) Fairstein
denied leaking this email, but given the circumstances--the
source who leaked it stated that it would "prove the case
against Jovanovic" (PX-50 at 1370) and the other
prosecutors and detectives involved in the case denied
leaking it (PX-2 at 209-2019, PX-8 at 456, PX-3 at 122-23,
PX-4, at 113-14)--a jury could reasonably find that only
Fairstein or her agent could have done so.

The virulence of the flood of negative publicity
against Jovanovic is apparent from a New York Post story
reporting that, when Jovanovic exited the courthouse on the
day following the grand jury's voting the indictment,
"[a]ngry bystanders taunted the accused cybersex fiend

Oliver Jovanovic with chants of 'Pervert! Pervert!'" (PX-50 at 1381)

The Fairstein-generated publicity resulted in attention-seekers, conditioned by the demonization of Jovanovic, emerging to give testimony derived from press accounts. Fairstein was a published crime-fiction writer at this time. Her first novel, "Final Jeopardy," was published six months before Jovanovic's arrest, and her second, "Likely to Die," was completed soon after the arrest. (PX-9 at 363) One witness, Maryjo Parlier Chambers, gave testimony at trial--totally uncorroborated and, according to Jovanovic, totally untrue--that in an Instant Message ("IM") to her he had admitted assaulting Rzucek and said he did so in order "to teach her a lesson for trusting someone." (PX-103 at 2391) Chambers acknowledged that she contacted the police only after reading about the case in the papers (PX-103 at 2400), and her trial testimony echoed both the leaked email discussed immediately above and the media coverage. For example, when asked a follow-up question at trial as to what the clause "you just can't go around doing this" meant, Chambers testified that it was "in regards to like showing them grewsome [sic] pictures and candle wax and everything else they had that he had mentioned." (PX-103 at 2399)

Yet, while there had been previous mention of gruesome pictures in the press, there had not been in Chambers' trial testimony, thereby indicating her familiarity with news coverage reporting on such pictures.[11]

The jury nevertheless found Jovanovic guilty, although, as the Appellate Division found, "the People were able to present to the jury a compelling story of a woman being drawn into a cyberspace intimacy that led her into the trap of a scheming man[, but] its compelling quality was due in part to its one-sided and unbalanced nature [that] resulted from the trial court's ruling precluding Jovanovic from effectively challenging certain aspects of the complainant's presentation," including "demonstrating that the complainant had consented to participating in sadomasochism and challenging her credibility as a witness." 263 A.D.2d at 190, 202.

---

[11]     Another witness who emerged months after Jovanovic's arrest, Vita DeLeon, a resident of his apartment building, professed at his trial to have heard noises, like muffled screams or moans, coming from his apartment during daylight hours on what may have been the weekend of the alleged incident, the only witness who claimed to have heard anything. (PX-104 2307-10)  But the superintendent of the building, Steve Ralbovsky, testified that DeLeon had told him she heard the noise around 10 or 10:30 in the evening, and he pointed out to her that the newspapers reported that Jovanovic and Rzucek did not get to the apartment until later than that night. (PX-105 2563-64)    Thus, the newspaper coverage apparently influenced DeLeon's trial testimony.

## Summary of Argument

In concluding that the malicious prosecution claim against Detective Bonilla was defeated by the presumption of probable cause arising from Jovanovic's indictment and by the existence of probable cause independent of that presumption, notwithstanding any fabrication of evidence by Bonilla, the district court misapprehended the importance of the fabricated evidence to the case as a whole; relied upon evidence neither known to Bonilla nor presented to the grand jury; improperly took from the jury the weighing of competing inferences; and failed to recognize that the malicious prosecution by Bonilla arose at the time he presented the fabricated evidence to the prosecutors, whose subsequent actions could not affect that tortious behavior.

Even had Bonilla possessed probable cause to arrest Jovanovic, that would not be a defense to Jovanovic's claim for denial of the "right to a fair trial," since Bonilla created false information likely to influence a jury's decision and forwarded it to the prosecutors.

ADA Fairstein's inflammatory extrajudicial statements to the press both caused a biased grand jury to indict Jovanovic and denied him a fair trial, consequences which-- contrary to the district court's assessment--a jury could reasonably find were foreseeable to Fairstein.

It exalted form over substance for the district court to rule that Jovanovic's <u>Monell</u> claim regarding the NYPD's failure to train Sex Crimes detectives was not sufficiently pled, because defendants incontestably had "fair notice" of that claim by the time of the summary judgment motion.

**Argument**

POINT I

THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DETECTIVE BONILLA ON THE CLAIM OF MALICIOUS PROSECUTION.

In concluding that the malicious prosecution claim against Detective Bonilla was defeated by the presumption of probable cause arising from Jovanovic's indictment and by the existence of probable cause independent of that presumption--notwithstanding any fabrication of evidence by Bonilla--the district court made several serious errors.

First, the court, in finding that such fabrication related to only one count of the 11-count indictment and thus was neither material to the finding of probable cause regarding the entire indictment nor the cause of any post-arraignment deprivation of liberty, misapprehended the importance of the fabricated evidence to the case as a whole, importance that a jury could easily appreciate, indeed that the criminal trial jury had been <u>urged</u> by the prosecutor to appreciate.

Second, the court, in assessing the existence of probable cause, relied upon evidence neither known to Bonilla nor presented to the grand jury. Third, the court, in concluding that any concerns about Rzucek's veracity would be "balanced out" by this additional evidence so as to support a finding of probable cause, improperly took this issue from the jury. See United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994)("[o]n a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried")(emphasis added).

Finally, the court failed to recognize that the malicious prosecution by Bonilla arose at the time he presented the fabricated evidence to the prosecutors, and that "what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior." Cameron v. City of New York, 598 F.3d 50, 63 (2d Cir. 2010).

(a.) Bonilla's Fabricated Evidence That He Saw
Burnt Candles in Jovanovic's Apartment And They
Had Been Removed When He Later Searched The Apartment
Was Highly Material to The Entire Indictment

Jovanovic claimed that Bonilla fabricated evidence when, consistent with Rzucek's claim that Jovanovic had

burned her with candle wax, Bonilla told the prosecutors and testified before the grand jury, as he did later at trial, that he saw two burnt candles on the table by the doorway of Jovanovic's apartment, but when he returned to the apartment with a search warrant--after arresting Jovanovic, telling him of the warrant and obtaining keys to the apartment from him--Jovanovic's mother was in the apartment and the candles were missing. The district court concluded that "[w]hile there may be a genuine dispute regarding the existence of candles in the apartment,[12] this is of little moment." (A-74; footnote omitted.) The court reasoned as follows:

> Bonilla's testimony regarding the candles was not the only testimony concerning candles and, besides, the candles relate to only one out of the eleven charges returned by the Grand Jury against Jovanovic: Assault in the Second Degree. Any inconsistency in testimony with regard to this single item could not have materially affected the Grand Jury's ability to come to its decision with regard to the entire indictment. In other words, although there may be a genuine dispute over whether there were, in fact, candles in Jovanovic's apartment, a resolution of that question is not material <u>and</u>, even assuming <u>arguendo</u> that Bonilla fabricated his testimony, this fabrication was not the cause of any post-arraignment or post-trial deprivation of liberty. (A-75; emphasis in original.)

---

[12] Defendants, in their memorandum of law in support of summary judgment, at 5 n.2, acknowledged that "Jovanovic's mother denies that she destroyed or secreted evidence, and Jovanovic denies that he had any candles in his apartment in 1996."

Consequently, the court concluded, the claimed fabrication did not rebut the presumption of probable cause, thereby defeating the malicious prosecution claim against Bonilla. (A-76) See Savino v. City of New York, 331 F.3d 63, 73 (2d Cir. 2003)("the existence of probable cause is a complete defense to a claim of malicious prosecution in New York"[13] and "indictment by a grand jury creates a presumption of probable cause" that may be rebutted only by "evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police misconduct undertaken in bad faith'"), citing Colon v. City of New York, 60 N.Y.2d 78, 83 (1983).[14]

---

[13] A plaintiff claiming malicious prosecution by a state actor must establish the elements of a malicious prosecution claim under state law. Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010).

[14] It is clear that the presumption of probable cause "may be overcome by evidence establishing that the police witnesses 'have not made a complete and full statement of facts … that they have misrepresented or falsified evidence … or otherwise acted in bad faith.'" McClellan v. Smith, 439 F.3d 137, 146 (2d Cir. 2006)(citation omitted)(emphasis added). The district court wrote that "[t]he presence of false testimony is not enough to raise an issue of material fact; there must be bad faith …." (A-73, citing McClellan.) To the extent that this suggests there must be false testimony and some additional evidence of bad faith, it is mistaken and distorts McClellan. See Savino v. City of New York, 331 F.3d at 72 (presumption may be rebutted "by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith'") quoting Colon v. City of New York, 60 N.Y.2d at 83.

In one critical respect, the district court's reasoning carries its own refutation. It is true that "Bonilla's testimony regarding the candles was not the only testimony concerning candles," but the only other testimony was Rzucek's, whose credibility or lack thereof was central to any finding by the grand jury. This was plaintiff's very point: that Rzucek's entire story was highly suspect and Bonilla's testimony about seeing the burnt candles was fabricated to lend it credibility.[15] The district court was apparently under the mistaken impression that during the grand jury presentation "both Rzucek and Bonilla testified, along with other witnesses." (A-67, citing "Larkin Dec., Ex. GG") But in DX-GG, the transcript of the prosecutor's instructions to the grand jury, the prosecutor states at page 2: "You will be hearing from two witnesses. The first witness is Jamie Rzucek and the second witness is Detective Milton Bonilla."

---

[15] It is significant that during Rzucek's grand jury testimony--prior to Bonilla's--a grand juror signaled skepticism by asking why, if her conduct was not consensual, she had taken off her blouse when Jovanovic said to do so. (DX-F at 44-45)

Defendants, in their memorandum of law in support of summary judgment, at 5 n.2 conceded that the candles which Bonilla testified he saw "corroborated J.R.'s account of the crime." (Memo ISO at 5 n.2)

The court similarly appears to have gone astray when, in summarizing Bonilla's and Rzucek's grand jury testimony about the candles, the court added: "and Jovanovic had online conversations with other women about using candle wax in a similar way." (A-74, citing "Larkin Dec., Ex. DD.") But no such evidence of online conversations was presented to the grand jury. Exhibit DD is the prosecution's "Molineux motion" to present evidence of other bad acts at trial. The court may have meant to cite Exhibit BB, a fax to the District Attorney's office containing such allegations, but that was not presented to the grand jury either.

Thus, the district court misapprehended the importance of Bonilla's grand jury testimony about seeing burnt candles. But even more potent than his testimony about seeing the candles was his testimony implying that Jovanovic's mother had destroyed this evidence, testimony which the district court appears not to have considered. Bonilla testified in the grand jury that when he obtained the keys to the apartment from Jovanovic he told Jovanovic that he had a search warrant. (DX-FF at 53-54) This testimony, carefully elicited by the prosecutor before the grand jurors, was clearly designed to convey the idea that Jovanovic thereby was given the opportunity to phone his

mother and tell her to rid the apartment of evidence before the searching party arrived.[16]   As the same prosecutor who presented the case to the grand jury told the trial jury in her opening statement:

> Perhaps unwisely, before they go to the apartment, Detective Bonilla goes down to the jail cell where the defendant is incarcerated and asks him for the keys to his apartment. He tells the defendant that he has a search warrant and he shows it to the defendant.
>
> The evidence will show that the defendant then makes three quick phone calls to his mother, to his parents' telephone number. This is sometime in the evening of December 5th.
>
> Detective Bonilla doesn't get to the apartment until early in the morning, approximately after 1:30 in the morning on December 6th. When he gets there the defendant's mother is in the apartment. She has chain locked the door against the detectives. She asked to see a copy of the search warrant, they show it to her.
>
> They go inside to execute the search warrant and low and behold, the candles, among other things, are gone. The candles they had seen at 10 o'clock that morning have been removed. (PX-86 70-71)

In summation, the prosecutor told the trial jury, "But, you know, the other thing that supports what Jamie Rzucek tells you is the defendant's own actions after he is arrested. What does this defendant do after he us

---

[16]   At Jovanovic's arraignment the prosecutor, in pressing for high bail, had argued that Jovanovic phoned his mother and she "destroyed evidence that the police had seen there earlier." (DX-U at 3)

arrested?" (PX-87 3348) The prosecutor, after recounting that Jovanovic had phoned his mother from the jail cell when Bonilla told him of the search warrant, argued, albeit totally on speculation:

> Mrs. Jovanovic has two hours in that apartment before Milton Bonilla gets there after 1:30, and what does she do at the defendant's direction?
>
> She takes the candles, she takes the strips of cloth, she takes the baton and she hides those things.
>
> *   *   *
>
> At ten o'clock in the morning on December 5th when [Bonilla] goes to the defendant's house, he picks up the defendant he sees red candles on the table in the entry way of the defendant's apartment, and when he comes back there at 1:30 in the morning Mrs. Jovanovic has chained the door against him and low and behold the candles are gone.
>
> Why does Mom throw out ordinary house candles? How does Mom know that these candles are important? Or the chain or the strips of cloth? She knows because the defendant has called her.
>
> Look at the telephone records, he has called her three or four times to tell her, "Mom, you better get over there. The cops are heading up there with a search warrant. Get rid of the stuff."
>
> There is a phrase called consciousness of guilt. (DX-87 3350-51)

A jury hearing Jovanovic's malicious prosecution claim against Bonilla could, indeed very likely would, recognize that his statements to the prosecutors and his grand jury testimony concerning the candles, if false, infected the

entire prosecution, not just a single count of the indictment.

The court's view that "this single item" (A-75), i.e., the fabrication about the candles, could not have materially affected the grand jury's decision regarding the entire indictment also failed to take into account Bonilla's grand jury testimony--false and misleading, plaintiff alleged--that he recovered from Jovanovic's apartment "strips of cloth" that were long enough to go around his waist and between an inch and a half, two inches wide, "similar to a necktie but not that fat." (DX-FF at 55-56) Rzucek testified before the grand jury that what Jovanovic tied her up with "was like ties, neckties, but it wasn't a necktie, it was strips of cloth" maybe two to three feet long and two to three inches wide. (DX-F at 23)

But Bonilla had actually recovered what he readily recognized to be karate belts, Jovanovic being a karate instructor according to Rzucek. (PX-2 at 335-41; DX-H at 4) Indeed, Bonilla specifically inventoried these items as "karate belts." (PX-2 at 336-37) Even though Rzucek did not identify the karate belts as the ties that were used (PX-8 at 74)--a fact never made known to the grand jury-- the grand jurors were led to believe that Bonilla had recovered the very "strips of cloth" that Rzucek claimed

32

she had been bound with, thus further corroborating her story.[17]   Yet the district court brushed aside the distinction between "strips of cloth" and karate belts as a "quibble over terminology." (A-74 n.3)[18]

The district court thus erred in taking the question of Bonilla's alleged fabrications away from a jury on the theory that they were not material and, therefore, were not the cause of deprivation of liberty.[19]

---

[17] By the time of trial, the prosecution was forced to abandon the notion that the karate belts were the "strips of cloth." Accordingly, the prosecution added the "strips of cloth" to the items they claimed Jovanovic's mother had removed from the apartment. (DX-87 3350-51) Similarly, forced at trial to abandon the notion that "the stick that looked like a baton" which Bonilla told the grand jury he recovered from the apartment (DX-FF at 54) was the baton which Rzucek told the grand jury she was hit and sodomized with (DX-F at 26,29), the prosecution claimed that Jovanovic's mother removed that too. (DX-87 3350-51)

[18] Plaintiff also alleged that Bonilla created a misleading videotape of himself opening up Jovanovic's futon with a mere "flick of the wrist"--thus corroborating Rzucek's version of what Jovanovic had done--when in fact Bonilla had first to loosen three wing nuts, an action not captured on the videotape. The court noted that the videotape, prepared for trial after indictment, was not presented to the grand jury and thus has no relevance to overcoming the grand jury presumption of probable cause. (A-74 n. 3) Yet a jury assessing Jovanovic's malicious prosecution claim against Bonilla would find it highly relevant to Bonilla's state of mind in promoting that prosecution. See Manganiello v. City of New York, 612 F.3d at 164 (although detective's misrepresentation was made after initiation of the criminal proceeding, the jury was entitled "to view that misrepresentation as indicative of [the detective's] state of mind all along").

[19] Even assuming arguendo that Bonilla's fabrication had affected only the one charge of Assault in the Second

33

(b.) A Jury Could Reasonably Find That The Presumption
of Probable Cause Was Overcome Because The Indictment
Was Secured through Perjury Or Bad Faith

Concomitantly, the court erred in concluding that the
presumption arising from the grand jury's indictment
defeated the malicious prosecution claim against Bonilla.
It is well settled that a presumption arising from the
grand jury's indictment "may be overcome by evidence
establishing that the police witnesses … 'have
misrepresented or falsified evidence.'" Boyd v. City of
New York, 336 F.3d 72, 76 (2d Cir. 2003), quoting Colon v.
City of New York, 60 N.Y.2d at 82. Thus, in Boyd, the
Court concluded that, "construing all inferences in the
light most favorable to Boyd, a jury could reasonably find
that the indictment was secured through bad faith or
perjury and there was malicious prosecution of Boyd," so
that "the issue of probable cause cannot be resolved by
summary judgment." 336 F.3d at 77. So too here, a jury
could reasonably find, construing all inferences in the

_____

Degree--of which Jovanovic was found guilty--the malicious
prosecution claim would proceed on that charge. Where a
plaintiff alleges malicious prosecution with respect to
several charges brought against him, probable cause is not
assessed collectively, but rather it is necessary "to
separately analyze the charges claimed to have been
maliciously prosecuted." Posr v. Doherty, 944 F.2d 91, 100
(2d Cir. 1991)(emphasis added)(error to instruct jury that
probable cause supporting any one of three charges
precluded liability for malicious prosecution).

light most favorable to Jovanovic, that Rzucek's story was not sustainable and that Bonilla fabricated evidence to lend it credibility, so that the indictment was secured through perjury or bad faith.

Moreover, Bonilla's egregious failure to inquire further into Rzucek's claims in order to substantiate them, see Statement of Facts at 13, provides an independent basis for overcoming the presumption of probable cause under governing New York state law. See Richards v. City of New York, 2003 U.S.Dist. LEXIS 8037 at *44 (S.D.N.Y. 2003)("[a] grand jury indictment creates a presumption of probable cause that can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures"), citing Harris v. State, 302 A.D.2d 716 (3d Dept. 2003); see also Hernandez v. State, 228 A.D.2d 902, 904 (3d Dept. 1996)(trooper's failure to investigate or substantiate "was sufficient to permit the trier of fact to infer grossly negligent conduct sufficient to overcome the presumption of probable cause"). This makes sense because, when information is received from a putative victim, probable cause exists "unless the circumstances raise doubt as to the person's veracity." Curley v. Village of Suffern, 269

F.3d 65, 70 (2d Cir. 2001).  To ignore or to fail to review available evidence that would raise, or add substance to, such doubts, as Bonilla did, undercuts the presumption of probable cause.  The district court, however, failed to address this prong of plaintiff's argument and evidence rebutting any presumption.

(c.)  The District Court's Conclusion That There Was Probable Cause Independent of The Presumption Is Factually Mistaken, Takes Conflicting Versions of The Facts From The Jury, And Erroneously Views The Prosecutor's Actions As Vitiating Any Malicious Prosecution by Bonilla

The alternate basis for the court's probable cause conclusion--namely, that "[e]ven without the presumption of probable cause generated by the Grand Jury indictment, and even without the candle-related evidence discussed above, the evidence presented to the Grand jury clearly supports a finding of probable cause" (A-76)--is also seriously flawed.  First, it attributes to Bonilla--and to the quantum of evidence supporting probable cause for Bonilla to pursue Jovanovic's prosecution--evidence unknown to Bonilla when he submitted fabricated evidence to the prosecutors.  Second, it is mistaken about what evidence was presented to the grand jury by the prosecutor.  Third, it takes from the jury the resolution of credibility conflicts and of choices between conflicting versions of the facts.  And, most importantly, it erroneously views the

prosecutor's actions as vitiating any malicious prosecution by Bonilla in submitting fabricated evidence.

The court's summary of the evidence supporting the alternate bases for its conclusion is as follows:

> Rzucek provided Bonilla with both an oral and written account of Jovanovic's crimes and separately told several other people about the incident, including Dubois, Powers, O'Connor, and Dr. Chin-Quee. In addition, Dr. Chin-Quee examined Rzucek on November 27, 1996 and the results of the examination were consistent with Rzucek's description of what Rzucek claimed Jovanovic did to her. Dr. Chin Quee found Rzucek to be credible, and described several different bruises and areas of tenderness consistent with Jovanovic's alleged acts. Any possible concerns about Rzucek's veracity would, in a reasonable juror's mind, be balanced out by this additional evidence, generating the necessary "knowledge or reasonably trustworthy information" for a finding of probable cause. See Panetta [v. Crowley], 460 F.3d [388] at 395 [2d Cir. 2006]. (A-77)

That Rzucek may have provided Bonilla with "both an oral and written account of Jovanovic's crimes" is of no positive weight, especially since Bonilla, so he testified, did not read her statement after she finished writing it, an account that varied from her oral account and raised further questions. (See Statement of Facts at 7-8) That Rzucek "separately told several other people about the incident" is similarly of no positive weight, because, assuming that her telling others had any weight at all,

Bonilla _never spoke_ to these individuals,[20] with the exception of O'Connor, head of security at Barnard, who encouraged Rzucek to go to the police "[f]rom the little bit that I had heard and the very general knowledge that I had gained" and who "avoided asking her any in-depth questions about what had taken place."[21] (DX-L at 51-52)

That Dr. Chin-Quee examined Rzucek and that the results were "consistent with" Rzucek's description of what she claimed Jovanovic did is of no weight, as is the fact that Chin-Quee found Rzucek credible, since Bonilla _neither interviewed_ Chin-Quee _nor read_ her report, which, in any event, was _inconsistent_ in critical respects with what Rzucek had told Bonilla, since it reported that Chin-Quee found no evidence of bruises, scratches or abrasions on the

---

[20] Moreover, Rzucek spoke to Chin-Quee and O'Connor on the same day she spoke to Bonilla, that is, after she had made up her mind to accuse Jovanovic. As to Dubois, the Appellate Division observed not only that evidence Rzucek had a sadomasochistic relationship with him should have been admitted, 263 A.D.2d at 198, but that the improperly redacted email messages were "also highly relevant to establishing the defense that the complainant concocted her accusation in order to explain to Luke [Dubois] either her failure to meet him that night, or her participation in sadomasochism with another man." _Id_. Rzucek did accuse Jovanovic to Emily Powers--and Powers did see a bruise--the day after Rzucek left Jovanovic's apartment (DX-C at 1421-22), but Rzucek had spent the intervening night in _Dubois_' apartment.

[21] When Rzucek was asked before the grand jury if she told O'Connor what happened to her, she testified, "Somewhat, not in, an entire story." (DX-F at 39)

vaginal area and no lacerations or bruises in the anal area, no evidence of vaginal or rectal bleeding, no bruises on Rzucek's thighs and no burn marks, no teeth marks, and no scabbing, swelling, redness or tenderness in the nipple area. (See Statement of Facts at 9) And Chin-Quee's notes reported that the patient has "no recollection of vaginal, rectal, or oral penetration." (DX-N at 53) Moreover, and importantly, the district court, in concluding that Chin-Quee's examination results were "consistent with" Rzucek's description of what she claimed Jovanovic did and in ignoring the critical ways in which the results were inconsistent, again was engaging in weighing the evidence and was doing so by viewing it in the light most favorable to the defendant, not the plaintiff.

When determining whether probable cause exists courts must consider those facts "available the officer at the time" of his actions. Panetta v. Crowley, 460 F.3d at 395; see also Devenpeck v. Alford, 543 U.S. 146, 152 (2004)("[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest")(emphasis added); Scott v. United States, 436 U.S. 128, 137 (1978)(court undertakes "an objective assessment of an officer's actions in light of the facts and circumstances

then known to him" and, judging the facts against an
objective standard, asks "would the facts available to the
officer at the moment of the seizure or the search 'warrant
a man of reasonable caution in the belief' that the action
taken was appropriate")(emphasis added). Thus, the
evidence summarized by the district court--about which
Bonilla knew nothing--does not contribute anything to a
finding that he had probable cause to pursue prosecution of
Jovanovic.

Indeed, Bonilla's egregious failure to investigate or
substantiate Rzucek's claims is evidence of lack of
probable cause. Lowth v. Town of Cheektowaga, 82 F.3d 563,
571 (2d Cir. 1996)("the failure to make a further inquiry
when a reasonable person would have done so may be evidence
of lack of probable cause"), citing Colon v. City of New
York, 60 N.Y.2d at 82.

Given Bonilla's ignorance of the evidence cited by the
district court, it would be irrelevant to the malicious
prosecution claim against Bonilla if this evidence were
presented to the grand jury, but it was not. Although
Rzucek testified before the grand jury that she told
DuBois, Powers and, to a limited extent, O'Connor, "what
happened," the court was mistaken in believing that either
Rzucek's written statement or evidence of the results of

any examination by Chin-Quee, or Chin-Quee's observations, had been presented to the grand jury. They simply were not. (See DX-F, FF)

In concluding about the purported additional evidence that "[a]ny possible concerns about Rzucek's veracity would, in a reasonable juror's mind, be balanced out by this additional evidence, generating the necessary 'knowledge or reasonably trustworthy information' for a finding of probable cause" (A-77; emphasis added), the court overstepped its bounds and improperly took this issue from the jury. On a motion for summary judgment, "the court is not to weigh the evidence, … but only to determine whether there are issues to be tried." United States v. Rem, 38 F.3d at 644. "Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." Id.

(d.) The District Court Failed to Recognize That, Once Bonilla Presented Fabricated Evidence to The Prosecutors, What They Did with It Afterwards Had No Effect on His Tortious Behavior

In citing the above-discussed additional evidence purportedly presented to the grand jury by the prosecutor, in also cataloging additional investigative steps taken by the prosecutor before presenting the case to the grand jury

(A-77), and, in particular, by stressing, in reference to Jovanovic's arraignment two weeks before his indictment, that "the decision to continue the prosecution at that point was made by the District Attorney's office, not Detective Bonilla" and thus Bonilla's investigative omissions are not relevant (A-76), the court appears to have failed to recognize that the malicious prosecution by Bonilla arose at the time Bonilla presented the fabricated evidence to the prosecutors and that "what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior." Cameron v. City of New York, 598 F.3d at 63; see also Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)("the initiation or continuation of a criminal proceeding against plaintiff" is an element of malicious prosecution under New York law)(emphasis added).

In Cameron, this Court rejected the defendants' argument that, because "prosecutors made independent decisions based on additional, corroborating evidence, and [the police officers] might therefore not be considered to have 'caused' or 'procured' the prosecution," grounds for liability were defeated. 598 F.3d at 63 (internal quotations omitted). Here, if Bonilla promoted the prosecution of Jovanovic through fraud, including creating

evidence and suggesting it was destroyed by Jovanovic's mother at his direction, the prosecution could not in fact exercise its "independent judgment." <u>See</u> <u>Higazy v. Templeton</u>, 505 F.3d 161 (2d Cir. 2007)("the chain of causation need not be considered broken if [the FBI Agent] deceived the subsequent decision maker or could 'reasonably foresee that his misconduct [would] contribute to an "independent" decision that results in a deprivation of liberty.'" <u>Id</u>. at 177 (citation omitted).

## POINT II

THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DETECTIVE BONILLA ON PLAINTIFF'S "FAIR TRIAL" CLAIM.

Even had Bonilla possessed probable cause to arrest Jovanovic, that would not be a defense to Jovanovic's section 1983 claim for denial of the "right to a fair trial" if Bonilla "create[d] false information likely to influence a jury's decision and forward[ed] that information to prosecutors." <u>Riciutti v. N.Y. City Transit Auth</u>., 124 F.3d 123, 130 (2d Cir. 1997). In <u>Ricciuti</u>, the Court "specifically held that the police had probable cause to arrest, but nonetheless reversed the district court's grant of summary judgment on the malicious prosecution claim because there was proof that the officers had later

manufactured false evidence." <u>Jocks v. Tavernier</u>, 316 F.3d 128, 138 (2d Cir. 2003), <u>citing</u> <u>Riciutti</u>, 124 F.3d at 128, 130.[22]

The district court, noting that in the case of fabrication of evidence by an investigating officer the deprivation of plaintiff's liberty must be shown to be the result of the officer's fabrication (A-79, <u>citing</u> <u>Zahrey v. Coffey</u>, 221 F.3d 342, 349 (2d Cir. 2000)), i.e., must be "likely to influence a jury's decision" (A-80, <u>citing</u> <u>Ricciuti</u>, 124 F.3d at 130), concluded, as with the malicious prosecution claim discussed in Point I, that the allegedly fabricated evidence regarding the candles "was not material to any other charge" except the one of Second Degree Assault and, thus, there was no genuine issue of material fact. (A-80)

---

[22] Jovanovic's Amended Complaint pled, in addition to the malicious prosecution cause of action against Bonilla, a cause of action for denial by Bonilla of the "constitutional right to a fair trial under the Due Process Clause." (Amended Complaint, ¶ 140) As was pointed out by District Judge Gleeson in <u>Mitchell v. Kugler</u>, 2009 U.S. Dist. LEXIS 4655 (E.D.N.Y. 2009), this Court in <u>Ricciuti</u> appeared to treat such a "fair trial" claim as a constitutional tort independent of malicious prosecution and irrespective of probable cause, whereas in <u>Jocks v. Tavernier</u>, the Court characterized the discussion in <u>Ricciuti</u> in terms of a malicious prosecution claim as to which the existence of probable cause ceases to be defense for the fabricator. <u>Mitchell v. Kugler</u>, 2009 U.S. Dist. LEXIS 4655 at *30.

The court erred in reaching this conclusion, for the reasons set forth in Point I, and all the more so since the question of probable cause is beside the point.[23] Bonilla, in presenting the prosecutors with fabricated evidence shoring up Rzucek's credibility, most assuredly "create[d] false information likely to influence a jury's decision." Riciutti, 124 F.3d at 127. "Because a reasonable jury could find against [Bonilla] on this issue, a genuine issue of material fact exists." Id. at 129.

POINT III

THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT FAIRSTEIN ON PLAINTIFF'S "FAIR TRIAL" CLAIM REGARDING HER EXTRAJUDICIAL STATEMENTS.

On Jovanovic's claim that Fairstein's unethical[24] extrajudicial statements to the press, see Statement of

---

[23] Bonilla's post-indictment/pretrial creation of a misleading videotape of himself purportedly opening up Jovanovic's futon with a mere "flick of the wrist," see n. 16, supra, which is relevant to Bonilla's state of mind on Jovanovic's malicious prosecution claim, is direct evidence on Jovanovic's "fair trial" claim, since it was likely to influence a jury's decision.

[24] The New York Rules of Professional Conduct provide in pertinent part that a lawyer participating in a criminal matter "shall not make any extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." 22 NYRRC 1200.0, Rule 3.6(a). The predecessor New York Code of Professional Responsibility was to the same effect. 22 NYRRC 1200.38, DR 7-107.

Facts at 17-20, both caused a biased grand jury to indict him and denied him a fair trial, the district court concluded that, even if Fairstein's statements were unwise and/or improper, Jovanovic had demonstrated neither causation nor injury stemming from the statements. The court asserted that the statements were made more than a year before the trial,[25] and Jovanovic could not show that other remedies--e.g., a change of venue motion, extensive voir dire, and challenges for cause relating to publicity-- were unavailable or ineffective as required by Powers v. Coe, 728 F.2d 97 (2d Cir. 1984). (A-81-84)

Under Powers v. Coe, to prevail on his claim Jovanovic was obliged to show that (1) there were extrajudicial statements for public communication regarding "matter improper within the canons of ethics and standards relating to prosecutorial functions and fair trial/free press"; (2) these statements in fact denied Jovanovic his due process rights; and (3) other remedies--like juror voir dire, peremptory and cause challenges and change of venue--were unavailable or to no avail. Id. at 105-06.

---

[25] Actually, extrajudicial statements continued to be made until trial. (See, e.g., PX-50 at 1384, PX-51 at 11840)

The court's analysis with respect to the impact of the Fairstein-generated publicity on the trial jury is not challenged on this appeal in light of <u>Powers</u>' requirement that other remedies were unavailable or to no avail. But the district court's analysis is misapplied to the grand jury, since the grand jury presentation occurred at the very flashpoint of the publicity and no remedies were available to Jovanovic in that forum, indeed his request for a remedy--questioning the grand jurors about their exposure to the publicity--was rebuffed by the prosecutor. <u>See</u> <u>infra</u>.

In addition, whatever the merit of the court's analysis regarding the impact of the Fairstein-generated publicity on the trial jurors, the publicity--which fanned the flames against Jovanovic while fostering Fairstein's emerging career as a crime-fiction writer, <u>see</u> Statement of Facts at 21--denied Jovanovic a fair trial by encouraging attention-seeking witnesses to come forward and falsely testify about Jovanovic based not on fact but on media coverage of the "Cybersex Case," trumpeted by Fairstein as her office's "first internet-related sex prosecution," which represented a "whole new entry in the acquaintance-rape category." (PX-50 at 1368, 1373)

(a.) A Jury Could Reasonably Find That The Prosecutor's Cursory Instruction to The Grand Jury Not to Consider Anything in The Newspapers Or on Television Was Inadequate to Neutralize The Prejudice to Jovanovic

As to the biased grand jury claim specifically, the district court stated that "the Judge presiding over the grand jury proceedings" found that the prosecutor's purported instructions to the grand jury "to disregard the media coverage concerning this case and to only consider the evidence presented" were sufficient. (A-82) Consequently, the district court concluded, "the chain of causation was 'broken by the intervening exercise of independent judgment.'" (A-83, quoting Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999).) That conclusion is flawed in every respect.

First, the judge who found the prosecutor's instructions to the grand jury sufficient was not "presiding over the grand jury proceedings," but was deciding pretrial motions seven months after the grand jury returned the indictment. (DX-PPP) Thus, the judge's ruling was not an "intervening" act at all, but an act that occurred well after imposition of the restrictions on Jovanovic's liberty that were occasioned by the indictment. See Jocks v. Tavernier, 316 F.3d at 136 ("the requirements of attending criminal proceedings and obeying the

conditions of bail suffice" to establish a post-arraignment seizure).  Not every act of subsequent participants in the legal system is a superseding cause that avoids liability of an initial actor, <u>Zahrey v. Coffey</u>, 221 F.3d at 351, and a factfinder can conclude that no superseding cause cut off liability.  <u>Higazy v. Templeton</u>, 505 F.3d at 175.[26]

More critically, and the motion judge's ruling notwithstanding, the prosecutor's instruction to the grand jury was woefully inadequate given the firestorm of negative publicity occurring immediately prior to and during the grand jury presentation, or so a jury could have reasonably concluded had summary judgment been denied. Significantly, prior to the grand jury presentation Jovanovic's counsel had specifically requested the prosecutor to, first, "refrain from further improper comments which can only prejudice the public's view of my client, such as '"We believe that this was not the first time he did something like this," said Linda Fairstein'"

---

[26]  In <u>Townes v. City of New York</u>, 176 F.3d 138, itself, relied upon by the district court, this Court held that a trial judge's erroneous decision not to suppress unlawfully seized evidence was an exercise of independent judgment that avoided liability of the police officers for the <u>ensuing</u> conviction and incarceration, the Court making a point of noting that Townes did not plead conduct tantamount to malicious prosecution or false imprisonment, but only a violation of his Fourth Amendment rights causing the "ultimate harm" he suffered by conviction and incarceration.  <u>Id</u>. at 145, 147.

(PX-59 at 2, _citing_ the New York Post[27]); and to, second, question the grand jurors "concerning the extent to which they have read and/or heard about this case in the media and what effect, if any, this press coverage may have on their ability to evaluate the evidence presented to them in a fair and impartial manner," so that, if biased or prejudiced by the publicity, a grand juror could be discharged under New York CPL § 190.20(2)(b). (PX-58 at 2; _see_ _also_ PX-60). _Cf._ _Foley v. Parker_, 488 F.3d 377, 387 (6th Cir. 2007)("[t]he primary tool for discerning actual prejudice [from pretrial publicity] is a searching voir dire of prospective jurors").

Rejecting these requests, the prosecutor simply told the grand jury at the start of the proceedings on December 13, 1996:

> There has been, you may have heard, some press about this case either in the newspapers or on television. I instruct you as a matter of law, that you may not consider anything you may have heard in the newspapers or on T.V. or anywhere outside the grand jury room.
>
> Okay, I instruct you, as a matter of law, to put those things out of your mind as you listen to the testimony today. (PX-84 at 2-3.)[28]

---

[27]  As noted above, the New York Post's December 8, 1996, front page carried a photograph of Jovanovic with the headline "Prosecutor: Cyber fiend struck before" and the banner "HOW MANY MORE VICTIMS?" (PX-51 at 11944).

[28]  The district court's rendition of this instruction --that the grand jurors were told "to disregard the media

When the grand jury reconvened on December 19, 1996, no instruction regarding publicity was given at all. (PX-84 at 65)

The district court's conclusion that the motion judge's ruling negated liability under these circumstances --or, put differently, that it took the issue away from a jury--is a dubious proposition. It is often said that jurors are presumed to follow cautionary instructions. United States v. Stewart, 433 F.3d 273, 307 (2d Cir. 2006); People v. Baker, 14 N.Y.2d 266, 274 (2010); but see Krulewitch v. United States, 336 U.S. 440, 453 (1949)(Jackson, J., concurring)("[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury …, all practicing lawyers know to be unmitigated fiction"); United States v. Delli Paola, 229 F.2d 319, 321 (2d Cir. 1956)(Learned Hand, J.)(a "placebo"). In such circumstances, however, the instructions are delivered by a judge--to whom jurors presumably accord singular respect, see Bollenbach v. United States, 326 U.S. 607, 612 (1946)("'[t]he influence of the trial judge on the jury is necessarily and properly of great weight' and jurors are

---

coverage concerning this case and to only consider the evidence presented" (A-82, emphasis added)--is not accurate.

ever watchful of the words that fall from him")(citation omitted)--not, as here, by a prosecutor, who is an advocate seeking a defendant's indictment.

The motion judge's reasoning that "[a] grand jury need not be instructed with the same degree of particularity that is required when a petit jury is instructed on the law" (DX-PPP at 2-3, citing People v. Calbud, 49 N.Y.2d 389, 394-95 (1980),) is true with respect to instructions on elements of a crime, as in Calbud, but it is quite another matter to suggest that a prosecutor's cursory instruction to disregard news stories suffices to neutralize prejudice. Fairstein herself was aware both that pretrial publicity "can obviously prejudice a juror's ability to make a decision based solely on the facts and evidence in the case" (PX-9 at 96) and that the notion that jurors "are telling you the truth, that they can set aside what they've heard and just listen" is only aspirational. (PX-61 at 2)

That when Jovanovic exited the courthouse on the day following the grand jury's voting the indictment, "[a]ngry bystanders taunted the accused cybersex fiend Oliver Jovanovic with chants of 'Pervert! Pervert!'," according to the New York Post (PX-50 at 1381), is stark evidence of the

toxic environment in which the grand jury considered the District Attorney's presentation.

Jovanovic's indictment was not a foregone conclusion. It bears repeating that during Rzucek's grand jury testimony a grand juror signaled skepticism by asking her why, if her conduct was not consensual, she had taken off her blouse when Jovanovic said to.[29]   (DX-F at 44-45) Nevertheless, a majority of the grand jurors voted to indict Jovanovic.  But for the Fairstein-generated adverse publicity, that may have not been the case.  Jovanovic is entitled to have a jury decide whether it was.

(b.) A Jury Could Find That It Was Foreseeable to Fairstein That Her Inflammatory Extrajudicial Statements Would Foster The False Testimony of A Witness Like Chambers, And Whether Chambers' Testimony--Contradicted by Jovanovic--Was False Was Not A Question for The Judge, But for A Jury

Rzucek's trial testimony was not the most damaging to Jovanovic, since it was so implausible and riddled with holes that Fairstein later characterized the case as one she thought "impossible" to prevail on (PX-63) and since defense counsel readily exposed the many defects in Rzucek's story.  Rather, it was the testimony of Maryjo Parlier Chambers that was most damaging, because she

---

[29]   Rzucek had actually testified it was a sweater and that she also took off her pants when he said to.  (DX-F at 16)("He told me to take my pants off, so I did.")

represented that in an IM to her from Jovanovic he had
<u>admitted</u> assaulting Rzucek, in order "to teach her a lesson
for trusting someone," a phrase reverberating with the
content of a damaging post-incident email from Jovanovic to
Rzucek leaked to the press by Fairstein or her agents.[30]
(<u>See</u> Statement of Facts at 20)

At Jovanovic's trial, after defense counsel argued in
summation that Chambers' testimony was derived from·the
news, the prosecutor, as just shown in the footnote, told
the jury, incorrectly, that "these emails were not printed
in the press... [y]ou saw them here for the first time"

---

[30] In that email, according to the news stories,
Jovanovic had said to Rzucek in part: "Is it a good idea to
go somewhere with someone you do not know? Do you think
you know how to defend yourself? Do you really know what
you are doing?" (PX-50 at 1368) With regard to that
email, which was published to the trial jury, the
prosecutor stated in her closing argument:

> She [Chambers] says that the defendant told
> her that he wanted to teach the woman that he
> attacked a lesson, and she shouldn't play such
> games.

> [Objection overruled.]

> These e-mails were not printed in the press.
> You saw them for the first time.

> How is [it] that MaryJo Chambers picked up
> that language from the only time anybody ever saw
> these e-mails was in court.

> She didn't get that from the press. (PX-87
> at 3347-48)

and, therefore, Chambers could not have based her testimony on news accounts. (PX-87 at 3347-48) During deliberations, the jury sent out a note asking to have Chambers' testimony read. (GX 92 at 3451-52) It is evident that the jury credited what amounted to the prosecutor's unsworn testimony, incorrect testimony, about the emails and thus concluded that Chambers had to be telling the truth.

But for the Fairstein-generated publicity, Chambers' publicity-based fabrication would never have arisen--since Chambers acknowledged contacting detectives only after reading a newspaper story about the case (PX-103 at 2400)-- and Jovanovic would more likely than not have been acquitted.

It is dismaying that the district court, in granting summary judgment on this claim, ruled that "there is no evidence that Chambers testimony was anything but truthful --indeed, she still maintains that her trial testimony was accurate." (A-83) But in Jovanovic's Declaration opposing summary judgment he attested that the only IMs he exchanged with Chambers were on November 19, 1996, and November 21, 1996, before his date with Rzucek, that it was his practice at the time to save all online conversations, and that he had saved the only two IMs with Chambers, copies of which

were attached as exhibits to his Declaration and neither of
which said anything remotely similar to what Chambers
claimed.[31]  (PX-47)

Thus, there <u>was</u> evidence that Chambers testimony was
untruthful, and so there was a quintessential issue of
material fact.[32]  Yet the district court in effect made a
factual determination, indeed a credibility determination,
that was for a jury to make.  <u>See</u> <u>United States v. Rem</u>, 38
F.3d at 644.

Similarly, the district court's alternate ruling--that
"[a]ssuming <u>arguendo</u> that Chambers' testimony was
manufactured from pre-trial publicity, Fairstein could not
have possibly foreseen Chambers' false testimony as a
result of her pretrial comments" (A-83)--flies in the face
of the principle that "foreseeability and causation … are
issues generally and more suitably entrusted to fact finder
adjudication."  <u>Higazy v. Templeton</u>, 505 F.3d at 175
(ellipsis the court's; citation omitted).  Moreover,
Fairstein's public acknowledgement that "both sides use the

---

[31]  The police seized Jovanovic's computers upon his
arrest, but introduced no other IMs between Jovanovic and
Chambers, indicating no others existed.
[32]  In their reply memorandum of law on summary
judgment, at 16, defendants in fact conceded that "[v]iewed
in the light most favorable to Jovanovic, this evidence
suggests that Ms. Chambers must have been lying when she
testified."

press to great advantage before you get anywhere near the trial stage" (PX-61 at 2) is evidence that she most assuredly could have foreseen that her statements would foster creation of witnesses like Chambers, particularly in light of Fairstein's status as a crime-fiction writer.

While it is true that summary judgment may be granted where the plaintiff "had not shown any facts suggesting that there was a causal link between the pretrial publicity and the claimed unfairness of his trial," Powers v. McGuigan, 769 F.2d 72, 76 (2d Cir. 1985)(emphasis added), here there were facts suggesting such a link: Fairstein made improper extrajudicial statements and disclosures to the press; Chambers read a newspaper story and contacted the detectives; Chambers' testimony, viewed in the light most favorable to Jovanovic, echoed disclosures that were in the press and was false; and Chambers' testimony was powerful evidence against Jovanovic at trial.

That high-profile cases attract attention-seekers is nothing unusual, and in actions under § 1983 a person is "responsible for the natural consequences of his actions." Zahrey v. Coffey, 221 F.3d at 357 (citation omitted). Fairstein's improper extrajudicial statements should not be insulated from liability, without trial by jury, under these circumstances.

POINT IV

THE DISTRICT COURT ERRED IN RULING THAT
PLAINTIFF'S MONELL CLAIM BASED ON THE NYPD'S
FAILURE TO TRAIN DETECTIVES REGARDING FALSE RAPE
CLAIMS WAS NOT SUFFICIENTLY PLED.

During discovery, including the depositions of detectives Bonilla and Cullen, it became apparent that the NYPD gave virtually no training to its detectives regarding false rape claims. (See PX-2 at 16; PX-3 at 113, 132) Plaintiff thereupon obtained from a retired Sex Crimes detective and expert on criminal investigations and false rape claims, Baeza, a comprehensive report in which he detailed "The NYPD's Inadequate Training on False Rape Claims." (See Statement of Facts at 15) Plaintiff's expert disclosure to defendants on July 2, 2009--six months before the close of discovery--specifically addressed "The NYPD's Inadequate Training on False Rape Claims" as set forth in Baeza's report, which was provided to defendants.

On August 12, 2009, defendant City produced Detective Giuntini for deposition, pursuant to plaintiff's notice under Fed. R. Civ. P. 30(b)(6), requesting "[t]he person most knowledgeable about the [NYPD's] Detective Bureau's personnel training regarding sex crime, including … determining unfounded and/or false allegations." (PX-18 at 10-11) Giuntini was examined about false rape claims and

testified that the NYPD's two-week course on sex crimes did not even address that subject. (PX-18 at 53)

Plaintiff's Amended Complaint, filed almost three years earlier, had alleged under the heading "SEVENTH CLAIM FOR RELIEF / MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983":

> 168. Defendants continued criminal proceedings against plaintiff despite a lack of credible evidence against him, and notwithstanding their knowledge that said proceedings would jeopardize plaintiff's liberty, well-being, safety and constitutional rights.

> 169. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, assistant district attorneys and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York, the New York City Police Department, the New York County District Attorney's Office and the Sex Crimes Unit, all under the supervision of ranking officers of said department, office and unit. (A-50-51)

The Amended Complaint went on to specify three such claims, two regarding the District Attorney's Office (¶¶ 170, 188) and one regarding the NYPD's policy or custom of allowing its personnel to make inflammatory statements to the press (¶ 179), but the Amended Complaint did not specify a claim regarding the NYPD's failure to train detectives regarding false rape claims.

The district court, in its decision granting summary judgment, ruled that paragraphs 168 and 169 of the Amended

Complaint did not sufficiently plead that claim, which had not been addressed in defendants' motion for summary judgment, but was addressed in plaintiff's opposition to it. (A-87 n. 11) The court consequently declined to recognize the claim. The court erred in so ruling.

With a failure-to-train cause of action, it is "unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 130 n. 10 (2d Cir. 2004). Although the plaintiff should still plead that the city's failure to train caused the constitutional violation, id., the pleading requirement will be met if a plaintiff alleges that the implementation of a formal policy which is officially endorsed by the municipality caused the plaintiff's injuries. Ambrose v. City of New York, 623 F.Supp.2d 454, 465 (S.D.N.Y. 2009), citing Perez v. Westchester County Dep't of Corrs., 2007 U.S. Dist. LEXIS 32638, 2007 WL 1288579, at *5 (S.D.N.Y. 2007). In the end, dismissal is not warranted as long as the defendant has "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Nesbitt v. County of Nassau, 2006 U.S. Dist. LEXIS 88262 at *16 (E.D.N.Y. 2006), quoting Conley v. Gibson, 355 U.S. 41, 47 (1957); see also Bell

_Atlantic Corp. v. Twombly_, 550 U.S. 544, 555 (2007)(Fed. R. Civ. P. Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the … claim is and the grounds upon which it rests," _citing_ _Conley_.)  The "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."  _Swierkiewicz v. Sorema N.A._, 534 U.S. 506, 512 (2002).

Here, it exalts form over substance to bar Jovanovic's NYPD failure-to-train claim, because, by the time of the summary judgment motion, defendants assuredly had "fair notice" of it through plaintiff's thorough expert disclosure and the deposition of Giuntini after notice under Fed. R. Civ. P. 30(b)(6) requesting "[t]he person most knowledgeable about the [NYPD's] Detective Bureau's personnel training regarding sex crime, including … determining unfounded and/or false allegations." Defendants were neither surprised by this claim nor prejudiced by its not being articulated in the Amended Complaint.  And the district court was fully in position on the summary judgment motion to define any disputed facts regarding this claim and determine its merit.  _Swierkiewicz_

<u>v. Sorema N.A</u>.  The claim should therefore be remanded for decision on its merits as to summary judgment.

## Conclusion

The judgment should be reversed.

Dated:  New York, New York
       March 12, 2011

                         Respectfully submitted,

                            /s/
                         Diarmuid White

                         Attorney for Plaintiff-
                          Appellant

**Certificate of Compliance with FRAP 32(a)(7)**

It is hereby certified that the annexed Brief of Plaintiff-Appellant Dr. Oliver Jovanovic contains 13,949 words, including footnotes and headings, and was printed in 12-point monospaced typeface in Microsoft Word format.

Dated:    New York, NY
          March 12, 2011


          __/s/_____
          Brendan White