# 10-4398

# United States Court of Appeals

*for the*

# Second Circuit

_____

DR. OLIVER JOVANOVIC ,

*Plaintiff-Appellant,*

v.

CITY OF NEW YORK, MILTON BONILLA, SHIELD NO. 61, individually and in his official capacity, LINDA FAIRSTEIN, NEW YORK COUNTY ASSISTANT DISTRICT ATTORNEY, individually and in her official capacity,

*Defendants-Appellees,*

and

GAIL HEATHERLY, NEW YORK COUNTY ASSISTANT DISTRICT ATTORNEY, individually and in her official capacity,

*Defendant.*

_____

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF OF PLAINTIFF-APPELLANT

Diarmuid White
WHITE & WHITE
148 East 78th Street
New York, NY 10075
(212) 861-9850

*Attorney for Plaintiff-Appellant*

*On the brief*
  Diarmuid White
  Brendan White

# Table of Contents

Page

Table of Authorities ..................................... ii

Preliminary Statement ..................................... 1

Argument ................................................. 1

    POINT I

        THE DISTRICT COURT ERRED IN GRANTING SUMMARY
        JUDGMENT TO DETECTIVE BONILLA ON THE CLAIM OF
        MALICIOUS PROSECUTION ................................ 1

    POINT II

        THE DISTRICT COURT ERRED IN GRANTING SUMMARY
        JUDGMENT TO DETECTIVE BONILLA ON PLAINTIFF'S
        "FAIR TRIAL" CLAIM ................................. 19

    POINT III

        THE DISTRICT COURT ERRED IN GRANTING SUMMARY
        JUDGMENT TO DEFENDANT FAIRSTEIN ON PLAINTIFF'S
        "FAIR TRIAL" CLAIM REGARDING HER EXTRAJUDICIAL
        STATEMENTS ......................................... 22

    POINT IV

        THE DISTRICT COURT ERRED IN RULING THAT
        PLAINTIFF'S MONELL CLAIM BASED ON THE NYPD'S
        FAILURE TO TRAIN DETECTIVES REGARDING FALSE
        RAPE CLAIMS WAS NOT SUFFICIENTLY PLED ............... 29

Conclusion ............................................... 31

# Table of Authorities

Page

<u>Cases</u>

<u>Bernard v. United States</u>,
25 F.3d 98 (2d Cir. 1994) ................................. 14

<u>Cameron v. City of New York</u>,
598 F.3d 50 (2d Cir. 2010) ..................... 1, 2, 13, 14

<u>Curley v. Village of Suffern</u>,
268 F.3d 65 (2d Cir. 2001) ............................... 15

<u>Gisondi v. Town of Harrison</u>,
72 N.Y.2d 280 (1988) ..................................... 10

<u>Hamilton v. Accu-Tek</u>,
62 F.Supp. 2d 802 (E.D.N.Y. 1999) ................... 27, 28

<u>Hanlin v. Mitchelson</u>,
794 F.2d 834 (2d Cir. 1986) .............................. 28

<u>Higazy v. Templeton</u>,
505 F.3d 161 (2d Cir. 2007) .................... 19, 25, 27

<u>Jocks v. Tavernier</u>,
316 F.3d 128 (2d Cir. 2003) ........................... 5, 18

<u>Jovanovic v. City of New York</u>,
2006 U.S. Dist. LEXIS 59165 (S.D.N.Y. 2006) ............. 16

<u>Llerando-Phipps v. City of New York</u>,
390 F. Supp.2d 372 (S.D.N.Y. 2005) ...................... 14

<u>Manganiello v. Agostini</u>,
2008 U.S. Dist. LEXIS 99181 (S.D.N.Y. 2008) ............. 14

<u>Manganiello v. City of New York</u>,
612 F.3d 149 (2d Cir. 2010) ............................... 6

<u>New York State Electric & Gas Corp. v. Secretary of Labor</u>,
88 F.3d 98 (2d Cir. 1996) ................................ 28

<u>People v. Huston</u>,
88 N.Y.2d 400 (1996) ..................................... 24

People v. Jovanovic,
263 A.D.2d 182 (1st Dept. 1999) ....................... 5, 11

Riciutti v. N.Y. City Transit Authority,
124 F.3d 123 (2d Cir. 1997) ............................. 19

Rothstein v. Carrier,
373 F.3d 275 (2d Cir. 2004) ............................. 14

Shecter v. Comptroller of the City of New York,
79 F.3d 265 (2d Cir. 1996) .............................. 23

Soares v. Connecticut,
8 F.3d 917 (2d Cir. 1993) ............................... 6

Townes v. City of New York,
176 F.3d 138 (2d Cir. 1999) ............................. 26

Zahrey v. Coffey,
221 F.3d 342 (2d Cir. 2000) ................. 18, 19, 25, 26

Statutes & Rules

N.Y. CPL § 210.35 ....................................... 24

Fed. R. Civ. P. 12 ..................................... 15

Fed. R. Civ. P. 15 ................................. 27, 28

Fed. R. Civ. P. 30 ..................................... 29

## Preliminary Statement

This reply brief addresses those contentions in the brief of Appellees ("the City") which warrant a response. The contentions not addressed have already been met by the facts and argument presented in Appellant Jovanovic's main brief.

## Argument

POINT I

THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DETECTIVE BONILLA ON THE CLAIM OF MALICIOUS PROSECUTION.

Although Jovanovic's claim on appeal is narrowly confined, temporally and substantively, to Detective Bonilla's fabrication of evidence when he brought Jovanovic's case to the District Attorney for prosecution, the City's brief ventures far and wide into every scrap of information arguably unfavorable to Jovanovic--tested or untested, introduced in evidence or never introduced, known to Bonilla or not--that surfaced during the ensuing 15 months of investigation by the District Attorney's office, up to and including Jovanovic's trial. The City does so without addressing or even mentioning Cameron v. City of New York, 598 F.3d 50 (2d Cir. 2010), which was prominently cited in Appellant's brief for this Court's articulation of the principle that "what prosecutors do subsequently has no

effect whatsoever on the police officer's initial, potentially tortious behavior." Id. at 63. As prejudicial to Jovanovic as the City may intend its agglomeration of far-flung facts to be, it fails to overcome the particulars of the actual claim raised in Appellant's brief.

**(a.) A Jury Could Reasonably Find That The Presumption of Probable Cause Was Overcome Because Bonilla's Fabricated Grand Jury Testimony Was Highly Material to The Entire Indictment**

Maintaining that the "totality of plaintiff's fabrication claim" is the assertion that Detective Bonilla testified falsely regarding seeing burnt candles that later disappeared from Jovanovic's apartment, the City argues that such a falsehood could not have materially impacted the decision to indict Jovanovic, because Jamie Rzucek[1] herself testified about Jovanovic's actions before the grand jury--which "necessarily found J.R. credible"--and because "Bonilla's testimony established that a number of items were recovered from the apartment which corroborated J.R.'s account, including the video 'Meet the Feebles,' four rolls of tape, a baton-like stick, and a book of photographs identical to the book J.R. described." (Appellees' Brf. at 28-29) This argument is seriously flawed.

---

[1] Although the district court's publicly available decision refers to "Jaime Rzucek," as does Appellant's brief, the City's brief refers to the putative victim as "J.R."

As to Bonilla's asserted corroboration of Rzucek, noticeably missing from the items listed by the City as recovered by Bonilla from Jovanovic's apartment, according to Bonilla's grand jury testimony, are the "strips of cloth" that were "similar to a necktie but not that fat" (DX-FF at 55-56), which, were it true, would corroborate Rzucek's grand jury testimony that what Jovanovic tied her up with "was like ties, neckties, but it wasn't a necktie, it was strips of cloth" maybe two to three feet long and two to three inches wide. (DX-F at 23) But, as pointed out in Jovanovic's main brief, Bonilla had readily recognized what he recovered to be karate belts, and inventoried them as such. (PX-2 at 335-41; DX-H at 4) The Court may take judicial notice that karate belts are over eight feet long, firm, and have several lines of stitching running lengthwise along the belt. See http://www.all-karate.com/124/karate-belt-length-width. Bonilla, when he testified before the grand jury, most certainly knew that the so-called "strips of cloth" he recovered were karate belts and were nothing like neckties, yet he misled the grand jury by describing them in a way that echoed Rzucek.[2]

_____

[2] The city asserts that plaintiff "does not allege that Bonilla's description of these items was inaccurate" (Appellees' Brf. at 30), but plaintiff most assuredly does.

Similarly, his grand jury testimony about a "stick that looked like a baton" or a "police baton like object" (DX FF at 54, 56) would offer some corroboration of Rzucek --who told the grand jury she was hit and sodomized with what looked like a police baton (DX-F at 26, 29)--if it were true, but it was not. As also noted in Jovanovic's main brief at 33 n.17, by the time of trial the prosecution was forced to abandon not only the notion that the karate belts were the "strips of cloth," but also that the stick was the baton described by Rzucek. Asked at trial if he had found a baton in the apartment, Bonilla now answered "No." (PX at 89 at 1581) As a consequence, the trial prosecutor was relegated to claiming, without basis, that Jovanovic's mother hid the strips of cloth and the baton too, like the candles. (DX-87 3350-51) Again, in front of the grand jury Bonilla was deliberately echoing Rzucek in describing the stick as a police baton, or so a jury could reasonably find.

Critical to the issue here, it was in relation to the very items that Rzucek testified were used to torture, injure and sodomize her--the candles, the baton and the "strips of cloth"--that Bonilla's testimony was false or intentionally misleading. Other items recovered by Bonilla, like a video and a book described by Rzucek and

4

tape, had negligible corroborative value, because Jovanovic never maintained that Rzucek did not come to his apartment, but rather that none of the alleged acts of violence occurred and the conduct that did occur was consensual. It bears repeating, especially considering the City's argument that the grand jury and trial jury found Rzucek credible, that Jovanovic's conviction was reversed because of the exclusion of evidence that was "highly relevant … to establish that she purposefully conveyed to Jovanovic an interest in engaging in consensual sadomasochism with him" and because the trial court "almost completely prevented Jovanovic from presenting the viable defense that the complainant had reason to fabricate the nonconsensual and violent elements of her story." People v. Jovanovic, 263 A.D.2d 182, 196, 199 (1st Dept. 1999).

Bonilla's corroboration of Rzucek's testimony about the violent crimes assertedly committed by Jovanovic--the very reason Bonilla was called as a witness before the grand jury--was false and likely to influence the jury's decision. The grand jury's finding that Rzucek's story was credible, essential to voting an indictment, was correspondingly corrupted. See Jocks v. Tavernier, 316 F.3d 128, 138 (2d Cir. 2003)(accused's constitutional rights violated when a police officer creates false

information **likely to influence** a jury's decision")(emphasis added); <u>Soares v. Connecticut</u>, 8 F.3d 917, 920 (2d Cir. 1993)(where law enforcement officer intentionally makes false statement necessary to finding of probable cause, right to not to be prosecuted without probable cause violated).[3]

As has been shown, Bonilla's testimony about the candles by no means represents the "totality of plaintiff's fabrication claim"; there was substantially more. Yet it is certainly the central component of the claim, since, unlike the "strips of cloth" and "baton" testimony, it was not merely misleading, but manufactured.[4] The City

---

[3] The City would apparently require that the falsehood be "crucial" to the finding of probable cause. (Appellees' Brf. at 27, <u>quoting</u> <u>Manganiello v. City of New York</u>, 612 F.3d 149, 162 (2d Cir. 2010)). Although such a crucial falsehood would undoubtedly overcome the presumption of probable cause, it is unlikely that the Court meant in <u>Manganiello</u> that <u>only</u> a "crucial" falsehood would do so, and not a falsehood "likely to influence a jury's decision" as in <u>Jocks v. Tavernier</u>.

[4] The City's half-hearted contention in a footnote that no jury could find this testimony fabricated because Jovanovic testified "equivocally" at his deposition that he did not think he "had any candles" in his apartment at the time and because his mother testified she did not see any candles (Appellees' Brf. at 28) is rather desperate, because it is apparent that Jovanovic was not only denying the presence of the candles Bonilla claimed to have seen on a table, but questioning the presence of <u>any</u> candles in his apartment, and because his mother could hardly have removed candles, as Bonilla led the grand jury to believe, if she never saw any. Accordingly, Defendants, in their

unwittingly aids plaintiff's cause by pointing out that "at the criminal trial, J.R. testified that the wax Jovanovic poured on her was from a white candle, while the candles Bonilla testified that he had seen were reddish in color." (Appellees' Brf. at 42 n.10)  The City's purpose in so stating is ostensibly to show that Bonilla's testimony about the candles could not have had much probative value. But the City proves too much.  According to Bonilla's "DD-5" report of his interview (DX-G), Rzucek never indicated to Bonilla the color of the candles which Jovanovic purportedly tortured her with, nor did she indicate the color in her written statement (DX-H) or her grand jury testimony (DX F).  Bonilla, however, when asked in the grand jury to describe the candles he purportedly saw on a table in Jovanovic's apartment was obliged to give them a color--"reddish"--presumably secure in the knowledge that this testimony could not be refuted since he was also to claim that the candles later disappeared.  Rzucek's subsequent claim at trial that the candles were white contradicted Bonilla, but that is not to say it was true.

---

memorandum of law in support of summary judgment, at 5 n.2, acknowledged that "Jovanovic's mother denies that she destroyed or secreted evidence, and Jovanovic denies that he had any candles in his apartment in 1996."

The candles, so a civil jury could reasonably find, were neither red nor white, but non-existent.

The City argues that Bonilla's testimony in the grand jury about the candles and their disappearance are inconsequential because before the grand jury the prosecutor--unlike the prosecutor at arraignment and trial --never made the argument, cited in Appellant's brief, linking the purported disappearance of the candles to the defendant's phone calls from jail and to his mother's presence in the apartment when Bonilla arrived to execute the search warrant. (Appellees' Brf. at 29-30) But while the prosecutor's presentation before the grand jury was not as fully developed as at arraignment and trial--nor could it be given that a prosecutor may not <u>argue</u> before a grand jury--the prosecutor carefully elicited the following from Bonilla in the grand jury:

> Q. Prior to the time you went to execute the search warrant, where did you obtain the keys to the apartment?

> A. Oliver Jovanovic was in the holding cells of the Tombs, I went downstairs and -- I went downstairs and got the keys from him for his apartment.

> Q. Did you tell him you had a search warrant?

> A. Yes, I did.

*　*　*

Q.   When you got there was there now somebody inside the apartment?

A.   Yes.

Q.   Who?

A.   His mother, Sabrina Jovanovic.

Q.   Did she immediately let you into the apartment?

A.   She -- I open the doors with the keys and the chain was on the door, she asked to see the warrant.  I gave her the warrant, she read it and then she allowed us in.

Q.   Did you notice anything missing from when you had been there prior in the morning?

A.   We didn't observe the candles that were on the table, they weren't there anymore.  (DX-FF at 53-53)

There could be no purpose in such questioning other than to link Bonilla's advising Jovanovic of the search warrant to his mother's presence in the apartment.  The intended implication was surely that Jovanovic had tipped off his mother to the search so that she could remove evidence.

Not only did Bonilla falsely corroborate Rzucek's story--or so a jury could reasonably find--and not only did he conduct no investigation of it at all, he did nothing to confirm the very facts he was corroborating.  For example, had Bonilla taken the trouble to show the karate belts and the stick to Rzucek after he recovered them--as the prosecutors apparently did later and concluded that they

could not be the "strips of cloth" or police baton that
Rzucek claimed were used in the violent crimes against her
--he could have questioned Rzucek about them and evaluated
her answers before going forward with Jovanovic's
prosecution and his own grand jury testimony. (Indeed, had
the prosecutor introduced the karate belts and stick in
evidence before the grand jury, that alone would have shown
that Bonilla's testimony did not truly corroborate Rzucek.)
Bonilla's failure to confirm even the facts about which he
was testifying is an "egregious" failure to investigate and
demonstrates that he was, at best, willfully indifferent to
the truth.

It is of course true, as the City points out, that
"the police are not obligated to pursue every lead that may
yield evidence beneficial to the accused … even though they
had knowledge of the lead and the capacity to investigate
it." (Appellees' Brf. at 32, quoting Gisondi v. Town of
Harrison, 72 N.Y.2d 280, 285 (1988).) But Bonilla did not
have to pursue any lead to simply ask the complainant if
those were the items used to torture and sodomize her.
Nor, similarly, did he have to pursue a lead to simply read
Rzucek's handwritten statement and Dr. Chin-Quee's notes,
which were in his very hands. Had he reviewed them in
tandem he would have seen Rzucek's writing that "he put

something inside me vaginally and anally" (DX H at 5) and Chin-Quee's writing, earlier on the very same day, "No recollection of vaginal, rectal, or oral penetration." (DX-N at 53) Since the most serious sex crimes charged against Jovanovic were to be Count Three, First Degree Aggravated Sexual Assault (inserting foreign object in rectum), and Count Four, First Degree Sodomy (contact between penis and anus), the discrepancy between Rzucek's statement and Chin-Quee's notes gave cause, by itself, for skepticism about Rzucek's story, if only those documents had been reviewed by Bonilla.[5]

The City defends Bonilla's failure to conduct even the most minimal fact checking,[6] by arguing that Jovanovic would

---

[5]     The City attempts to explain Chin-Quee's note--"No recollection of vaginal, rectal, or oral penetration"--by her trial testimony that she was referring only to penile penetration. (Appellees' Brf. at 34)  But, putting aside that Jovanovic was also charged with First Degree Sodomy (contact between penis and anus), it is impossible to believe that an examining physician would omit from her notes a patient's telling her that she had been anally or vaginally penetrated with a foreign object like a police baton.

[6]     Given Bonilla's failure to review the evidence actually in his possession, it may have been too much to expect of Bonilla that he would have interviewed Luke DuBois--the first person Rzucek said she had spoken to about the incident and the person in whose room she had slept--but the City's contention that the record discredited plaintiff's claim that Dubois caused her bruising (Appellees' Brf. at 36) invites the response that the Appellate Division, in reversing Jovanovic's conviction, held that excluded evidence of Dubois'

11

not have been helped by further investigation, pointing to reports from other women that "prosecutors had learned about," or "after the indictment, law enforcement authorities obtained additional corroborating evidence," or "further investigation uncovered" Jovanovic's IM to one Sacred Soul, or "prosecutors had evidence that" Jovanovic kept lists of the screen names of women interested in S&M encounters. (Appellees' Brf. at 34-36) The City concludes that even assuming any further investigation could raise questions about probable cause, "it is undisputed that after arraignment all decisions concerning the prosecution were made by the DA's office, not Bonilla" and thus "Bonilla cannot be held responsible for the DA's decision to continue the prosecution."

It is not necessary here for Jovanovic to challenge any of the evidence that "prosecutors had learned about," because such evidence, whatever its worth or lack thereof, is irrelevant to his claim against Bonilla.[7] That is so, as indicated at the outset, because "what prosecutors do

---

involvement in a sadomasochistic relationship with Rzucek should have been admitted to support the argument that he had caused Rzucek's bruising. 263 A.D.2d at 196, 198.

[7] That said, plaintiff demonstrated in the district court that this "evidence" was spurious (Plaintiff's Rule 56.1 Statement at ¶¶ 88-98), yet the City has described the evidence without any reference to the facts disproving it.

subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior." <u>Cameron v. City of New York</u>, 598 F.3d at 63. The City's argument is virtually identical to the following argument that the <u>Cameron</u> Court expressly rejected: because "prosecutors made independent decisions based on additional, corroborating evidence, and [the police officers] might therefore not be considered to have 'caused' or 'procured' the prosecution," grounds for liability were defeated. <u>Id</u>. at 63 (internal quotations omitted). In rejecting that argument the <u>Cameron</u> Court stated:

> Appellees' theory misunderstands the function of a screening prosecutor in relation to a malicious prosecution claim. The prosecutor's actions do not supersede the complaining officer's actions; they only determine whether the officer's actions come to fruition--that is, whether the officer committed the tort of malicious prosecution, or merely <u>attempted</u> to prosecute maliciously.

<u>Id</u>. at 65 (emphasis in original). The City's silence as to <u>Cameron</u> is deafening.

Any break in the "chain of causation" with respect to Jovanovic's prosecution (Appellees' Brf. at 37) occurred <u>after</u> Bonilla's tortious conduct in presenting the fabricated evidence to the prosecutors. Indeed, the <u>Cameron</u> Court indicated that even the "independent judgment" of a <u>grand jury</u> or prosecutor will not cut off

liability for malicious prosecution "when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." Id. at 64, citing Llerando-Phipps v. City of New York, 390 F.Supp.2d 372, 383 (S.D.N.Y. 2005)(internal quotation marks omitted). Consequently, it is not even necessary for Jovanovic to show that Bonilla's testimony before the grand jury corrupted that process so as to overcome the presumption of probable cause arising from the indictment, although Jovanovic has done so above; Bonilla's forwarding the fabricated information to the prosecutors, by itself, defeats the presumption. See Manganiello v. Agostini, 2008 U.S. Dist. LEXIS 99181 at *15 (S.D.N.Y. 2008)(where the defendant is a police officer, "the plaintiff's avenue for rebuttal is not limited to proof of misconduct in the grand jury alone," but rather, the plaintiff may show the officer misrepresented facts to the prosecutor in a way that led to indictment), citing Rothstein v. Carrier, 373 F.3d 275, 282-83 (2d Cir. 2004).[8]

---

[8]   Elsewhere in its brief the City cites Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994), with the parenthetical that "evidence that arose after defendant's arrest bolstered probable cause" (Appellees' Brf. at 36), But Bernard has no bearing on the Cameron holding.   In Bernard, plaintiff, who did not allege that the arresting agents fabricated evidence, argued that, even if probable cause existed at the time of his arrest, intervening facts

(b.) A Jury Could Reasonably Find That Bonilla
Had No Probable Cause As A Matter of Law

The City maintains that, even without the presumption
of probable cause arising from the indictment, probable
cause existed to go forward with criminal proceedings
against Jovanovic based on information received by Bonilla
from the putative victim, "unless the circumstances raise
doubt as to the person's veracity," (Appellees' Brf. at 38-
39, citing Curley v. Village of Suffern, 268 F.3d 65, 69-70
(2d Cir. 2001)), and that "there was no basis to doubt
J.R.'s account." (Appellees' Brf. at 39)

Not only was there a basis to doubt her account, but
the fact that Bonilla waited nine days to arrest Jovanovic
after interviewing Rzucek and being shown where he lives
indicates that Bonilla actually did doubt her account. As
the district court observed in ruling on defendants' Rule
12(c) motion (c):

> Ruzcek's graphic and detailed statement to
> Bonilla alleged horrific acts by the Plaintiff.
> If, as Defendants now claim, Ruzcek was

---

should have triggered additional investigation into his
claims of innocence. This Court pointed out that those
intervening facts occurred after indictment and, therefore,
once the grand jury indicted Bernard, control of the
prosecution passed to the prosecutor and was no longer
within the agents' authority. Id. at 104. Here, as in
Cameron, plaintiff's claim focuses on the police conduct--
fabrication of evidence to support probable cause--before
indictment.

> completely credible and her statement
> automatically created probable cause to arrest,
> then Bonilla would not have waited nine full days
> before arresting Jovanovic. The fact that he did
> suggests that Bonilla himself doubted Ruzcek's
> story at the time that it was made.

Jovanovic v. City of New York, 2006 U.S. Dist. LEXIS 59165 at *21 (S.D.N.Y. 2006).

Even putting aside the delay, there was, as demonstrated above, basis to doubt Rzucek's account, had Bonilla been truthful: there were no candles, baton or "strips of cloth" in Jovanovic's apartment, as Rzucek's story would have led one to conclude. Ironically, the City states that "Bonilla's testimony detailing a number of items recovered from the apartment which J.R. expressly referenced in her testimony, corroborated this testimony." (Appellees' Brf. at 39) But a jury could reasonably conclude that his testimony about those items was false, willfully false, corroboration. Other "circumstances raising doubt as to the person's veracity" also existed-- most notably the contradiction between what Rzucek wrote about penetration and what she told Chin-Quee about penetration--but Bonilla unjustifiably blinded himself to that contradiction by not reading the statements given to him.

The City defends reliance on evidence not presented to the grand jury, espousing the remarkable theory that "details regarding this evidence came out during J.R.'s testimony," that is, although the asserted witnesses she referred to did not testify, "the Grand Jury was informed that this evidence exists." (Appellees' Brf. at 38-39) In other words, Rzucek corroborated herself!

The City falls back on the argument that "the proper inquiry is to determine whether <u>the prosecution</u> had sufficient evidence to proceed with the criminal prosecution" (Appellees' Brf. at 40; emphasis added), but-- even assuming that evidence never presented to the grand jury could be considered, for which the City cites no authority--once again the City ignores the teaching of <u>Cameron</u>.


POINT II

THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DETECTIVE BONILLA ON PLAINTIFF'S "FAIR TRIAL" CLAIM.

The City contends that the allegedly fabricated evidence--which the City limits to the candles, ignoring the "strips of cloth" and baton--is not material and merely demonstrates some evidence of consciousness of guilt. (Appellees' Brf. at 41-42) The City contrasts this case

with those where the fabrication goes to "the very essence of the claim." (Appellees' Brf. at 41) But Bonilla arrested Jovanovic and promoted Jovanovic's prosecution on the word of the complainant alone, which Bonilla falsely corroborated in bringing the case to the prosecutor. That would appear to go to the very essence of the claim, but in any event is undeniably material. And it is material to every crime with which Jovanovic was charged--including kidnapping (see Appellees' Brf. at 43)--because Rzucek's credibility was essential to every charge.[9]

The City cites a footnote in Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000), for its statement that "[t]he initial wrongdoer _might_ avoid liability where the intervening decision-maker would have precipitated the deprivation of liberty, even in the absence of the antecedent misconduct; in that circumstance, 'but for' causation could be claimed to be lacking." (Appellees' Brf. at 41, citing id. at 352 n.4 [actually n.8]; emphasis added.) This note, however, is a reflection on a statement

---

[9] The City focuses on Jovanovic's conviction in discussing causation (Appellees' Brf. at 43), but the deprivation of Jovanovic's liberty caused by Bonilla's fabrications arose from the beginning of the case, not the end. See Jocks v. Tavernier, 316 F.3d at 136 ("the requirements of attending criminal proceedings and obeying the conditions of bail suffice" to establish a seizure within the meaning of the Fourth Amendment).

in the text that "it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty." Id. at 352. The Zahrey Court left the discussion unresolved, because it did not apply to the facts in that case.

In any event, here, as in the Zahrey text, Bonilla could reasonably foresee that his misconduct would contribute to an "independent" decision that resulted in a deprivation of Jovanovic's liberty and, as in the Zahrey note, there is no basis to conclude that an "intervening decision-maker," a prosecutor, would have precipitated the deprivation of Jovanovic's liberty even if Bonilla had not "create[d] false information likely to influence a jury's decision and forward[ed] that information to prosecutors." Riciutti v. N.Y. City Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); see also Higazy v. Templeton, 505 F.3d 161 (2d Cir. 2007)("the chain of causation need not be considered broken if [the FBI Agent] deceived the subsequent decision maker or could 'reasonably foresee that his misconduct [would] contribute to an "independent" decision that results in a deprivation of liberty.'" Id. at 177 (citation omitted).

POINT III

THE DISTRICT COURT ERRED IN GRANTING SUMMARY
JUDGMENT TO DEFENDANT FAIRSTEIN ON PLAINTIFF'S
"FAIR TRIAL" CLAIM REGARDING HER EXTRAJUDICIAL
STATEMENTS.

The City boldly asserts that "None of Fairstein's
Alleged Statements Violated Canons of Ethics."[10]
(Appellees' Brf. at 45) The City paraphrases what DR 7-107
permits, and then justifies Fairstein's statements as
simply "descriptive," "accurate," "flesh[ing] out another
detail," not "likely to prejudice the proceedings," and so
forth. Accordingly, for example, her statement to a New
York Times reporter ("Ms. Fairstein said") that the case
represents "a whole new entry in the acquaintance rape
category" was "purely descriptive and accurate," even
though Jovanovic was not accused of rape; her statement to
a New York Post reporter ("Fairstein said") that "He
terrorized this young woman to the point that she was too
frightened to call the authorities until weeks after it
happens" was permissible because it "could not have

<hr>

[10] In a footnote, the City also asserts that plaintiff
does not identify publicity directly attributed to comments
made by Fairstein but rather ascribes all the publicity to
her. (Appellees' Brf. at 44 n.11) But at pages 18-20 of
Appellant's Brief, he block-quotes stories from the press
repeatedly making attributions such as "Ms. Fairstein
said," "Fairstein said," "Fairstein told Channel 5," "said
Linda Fairstein, head of the Manhattan district attorney's
sex crimes unit," and "sex-crimes prosecutor Linda
Fairstein said."

materially prejudiced the criminal case"; and her statement again to a Post reporter ("said Linda Fairstein") that "We believe that this was not the first time he did something like this" was permissible because <u>after</u> her statements some women surfaced who "corroborated her belief" and because prosecutors are permitted to request assistance in obtaining evidence. (Appellees' Brf. at 46-48))

The City's self-serving view of DR 7-107 is seriously wanting. Plaintiff's opposition to the summary judgment motion was supported by the Declaration of Bennett Gershman, a professor at Pace University School of Law who has taught courses on Prosecutorial Ethics and Judicial Ethics and who was a New York County Assistant District Attorney for six years. (PX-46) Gershman, unlike the City, quotes from DR 7-107(b) categories of statements that are <u>not</u> permissible, that is, according to the rule, "ordinarily [are] likely to prejudice materially an adjudicative proceeding," including:

> 1. The character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness.

> 3. … the identity or nature of physical evidence expected to be presented.

4. Any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration.

5. Information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial.

6. The fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

(PX-45 at 3; see also Exhibit B to PX-45 setting forth text of DR 7-107.)

Gershman concluded that Fairstein's statements violated DR 7-107 in the numerous ways, including:

-- Ms. Fairstein repeatedly opined on defendant's guilt and maligned his character, and vouched for the complaining witness, in violation of DR 7-107(b)(1) and (4), by stating that he (a) "terrorized this young woman," (b) that "we believe this is not the first time he did something like this"; (c) that "he was so prepared for this and carried it off so smoothly"; (d) that "we feel her courage for coming forward"; (e) that "she was too frightened to call the authorities until weeks after it happened"; and (f) that "the stunned victim told her friends about the attack – and event[ually] went to a doctor -- but was too terrified to tell police";

-- Ms. Fairstein revealed extensive information concerning the witness's "expected testimony," and the "evidence expected to be presented," in violation of DR 7-107(b)(1) and (3). In short she described (a) details about when the parties first corresponded, the time their date began, the complainant's first

impressions of plaintiff, and the time the
complainant ultimately left; (b) plaintiff's
alleged actions during the incident, including
tying the complaining witness's legs to a chair,
playing a violent movie and referencing Jeffrey
Dahmer; (c) evidence seized by the police,
including evidence that never existed; (d)
revealed evidence seized [by] her subpoena to
AOL; (e) and stated that "prosecutors have an
expert witness who will explain how a baton-
wielding attacker could sodomize a victim without
leaving telltale marks."

-- Ms. Fairstein also stated that "there are
other victims," in violation of DR 7-107(b)(1),
(4), and (6), despite the fact that information
concerning prior bad acts would likely be
inadmissible at trial.

(PX-45 at 4)

A jury could certainly accept Gershman's testimony

that Fairstein's extrajudicial statements were improper and

unethical.[11] So, too, could a jury conclude that Fairstein

or her agent--despite their unsurprising denials

(Appellees' Brf. at 49)--leaked to the press for

publication on December 7, 1996, the post-incident email

---

[11] The City, in proposing that Fairstein is entitled
to qualified immunity, states that reasonable officials
might disagree as to whether the extrajudicial statements
violated governing ethical canons. (Appellees' Brf. at 50)
While it is conceivable that reasonable officials might
disagree over one or two statements, it is inconceivable
that they would disagree as to all the statements. In any
event, Fairstein's extrajudicial statements were outside
the scope of her official duties. See Shecter v.
Comptroller of the City of New York, 79 F.3d 265, 268 (2d
Cir. 1996)(defendant claiming immunity "must show that the
conduct of which the plaintiff complains falls within the
scope of the defendant's official duties").

which "the source" who supplied it stated, countering defense counsel, that it "would instead prove the case against Jovanovic" (PX-50 at 1370), hardly something a representative of the defense would say if the source. <u>See</u> Appellees' Brf. at 50 ("Jovanovic's counsel could just as easily be the source of the leak").

The City maintains that, even assuming Fairstein's statements were unethical, Jovanovic has not demonstrated a "causal connection" between that conduct and his injury, namely, his indictment by a grand jury exposed to the statements. (Appellees' Brf. at 51) The City makes the circular argument that because the evidence presented to the grand jury was legally sufficient, injury in fact is "legally unsustainable." (Appellees' Brf. at 51) Of course, what is at issue is the grand jury's ability to <u>evaluate</u> that evidence--including Rzucek's credibility--fairly and impartially. "When the Grand Jury is subjected to improper influence and bias, its ability to discharge these essential functions fairly and reliably is necessarily undermined." <u>People v. Huston</u>, 88 N.Y.2d 400, 401 (1996)(indictment found by grand jury dismissed due to prosecutorial misconduct during presentation).[12] And

---

[12] The court pointed out in <u>Huston</u> that "CPL 210.35(5) provides that a Grand Jury proceeding is defective when

Fairstein herself knew that pretrial testimony "can obviously prejudice a juror's ability to make a decision based solely on the facts and evidence in the case." (PX-9 at 86)

In actions under § 1983 a person is held "responsible for the natural consequences of his actions," Zahrey v. Coffey, 221 F.3d at 357 (citation omitted). And whether there is a causal connection between Fairstein's statements and the vote by a majority of grand jurors to indict Jovanovic is a jury question. Higazy v. Templeton, 505 F.3d at 175 ("foreseeability and causation … are issues generally and more suitably entrusted to fact finder adjudication") (ellipsis the court's; citation omitted).

The City similarly maintains that Jovanovic's claim regarding the inadequacy of the instruction given by the prosecutor to the grand jury about media coverage also fails because, so long as legally sufficient evidence is presented, the integrity of the grand jury process is not impaired. (Appellees' Brf. at 52-53) But again it is the grand jury's ability to evaluate that evidence fairly and impartially that is at issue.

---

'the integrity thereof is impaired and prejudice to the defendant may result,'" the court noting that the Legislature rejected earlier drafts of the statute that would have required actual prejudice, in favor of requiring only that prejudice "may" result. 88 N.Y.2d at 409.

As did the district court, the City invokes Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999), for the notion that the state court judge's order finding the instruction adequate was an "intervening exercise of independent judgment" breaking the chain of causation between Fairstein's statements and the indictment. (Appellees' Brf. at 52)  But Townes held that the trial court's failure to suppress evidence constituted a "superseding cause of Townes's conviction and sentence," preventing liability for harm subsequent to the suppression ruling from conduct antecedent to the ruling.  Id. (emphasis added).  Here, the state court judge's ruling could not cut off liability for the harm asserted by Jovanovic--his indictment by a grand jury exposed to Fairstein's statements--because that harm occurred prior the ruling.

Finally, the City again contends that Jovanovic cannot demonstrate causation, or foreseeability, with respect to Fairstein's statements and Mary Jo Parlier Chambers' trial testimony. (Appellees' Brf. at 54)  But, again, a person held "responsible for the natural consequences of his actions," Zahrey, 221 F.3d at 357, and causation and

foreseeability are issues for the jury.  _Higazy_, 505 F.3d
at 175.[13]


POINT IV

THE DISTRICT COURT ERRED IN RULING THAT
PLAINTIFF'S _MONELL_ CLAIM BASED ON THE NYPD'S
FAILURE TO TRAIN DETECTIVES REGARDING FALSE RAPE
CLAIMS WAS NOT SUFFICIENTLY PLED.

The City maintains that it is fatal to plaintiff's
_Monell_ claim regarding the NYPD's failure to train
detectives regarding "false rape" claims that he did not
include that claim in the Amended Complaint or seek leave
to amend the complaint to include it.  (Appellees' Brf. at
55-57)

Rule 15(b) provides that a party "may move at any
time--even after judgment--to amend the pleadings to
conform them to the evidence and to raise an unpleaded
issue" where the issue "is tried by the parties' express or
implied consent."  Consent does not entail the non-moving
party's permission, implied or express, _Hamilton v. Accu-
Tek_, 62 F.Supp.2d 802, 817 (E.D.N.Y. 1999), but rather it

---

[13] The City suggests that the criminal verdict
demonstrates the jury rejected the defense's claim that
Chambers' testimony was fabricated from a newspaper story
(Appellees' Brf. at 54-55), specifically from an email
described in the story.  But that jury was told by the
prosecutor in summation, incorrectly, that the email had
never been in the press, when in fact it had been.  (_See_
Appellant's Brf. at 54-55)  If the jury had been told the
truth, it likely would have rejected her testimony.

depends "on the opponent's awareness that the issue was being litigated." Id. Although these principles apply where there is a trial, this Court has permitted a party to amend a complaint after discovery has been completed and defendants have filed summary judgment motions, even when the basis for the amendment existed at the time of the original complaint. See Hanlin v. Mitchelson, 794 F.2d 834 (2d Cir. 1986). And "Rule 15(b) requires no motion or formal amendment of the pleadings." New York State Elec. & Gas Corp. v. Secretary of Labor, 88 F.3d 98, 105 (2d Cir. 1996). Finally, the Court has noted that "a party's failure to plead an issue it later presented must have disadvantaged its opponent in presenting its case." Id. at 104.

Here, the City has neither been prejudiced nor claimed prejudice arising from the failure to plead the issue. Nor could the City. At the depositions of Detectives Bonilla and Cullen they were questioned about their lack of training (see PX-2 at 16, 280; PX-3 at 113, 132, 136-37); plaintiff's expert disclosure six months before the close of discovery, to which the City never objected, specifically addressed "The NYPD's Inadequate Training on False Rape Claims," as set forth in the expert report of a retired NYPD sex crimes detective; and Detective Giuntini,

produced by the City for deposition under Rule 30(b)(6), was examined about false rape claims. (PX-18 at 53, 136, 157-58, 164-65) Thus the City was "aware[] that the issue was being litigated." Hamilton v. Accu-Tek, supra.

Given the absence of any prejudice to the City and given that pleadings may be liberally and informally amended, as shown above, it exalted form over substance to dismiss plaintiff's Monell claim on summary judgment under the circumstances of this case.

## Conclusion

The judgment should be reversed.

Dated: New York, New York
       June 27, 2011

                              Respectfully submitted,

                              _____/s/_____
                              Diarmuid White

                              Attorney for Plaintiff-
                               Appellant

**Certificate of Compliance with FRAP 32(a)(7)**

It is hereby certified that the annexed Reply Brief of Plaintiff-Appellant Dr. Oliver Jovanovic contains 6275 words, including footnotes and headings, and was printed in 12-point monospaced typeface in Microsoft Word format.

Dated:   New York, NY
         June 27, 2011

                    ___/s/_____
                    Brendan White